LEAVITT, Receiver of the North American Trust and Banking Company *v.* YATES and others.

Where an act is done by a company pursuant to a resolution of a board of its directors at a meeting not objected to by its officers at any time, the mere regularity or irregularity in the convening of that board will not be an objection to the act done. The power to do the act is another question.

An association, under the general banking law, may borrow money to discount notes and also to purchase state stocks and other securities to be deposited with the comptroller; but it has no right to borrow money to be used in speculations or in mercantile or other business having no relation to the ordinary business of a bank.

Directors of a company are but agents for the benefit of others.

If an association under the general banking law has made extensive operations of a speculative character in state stocks and, thereby, become greatly embarrassed, it cannot raise funds by an issue of its notes or obligations, secured by a pledge or assignment in trust of its remaining assets in order to satisfy creditors whose demands have not grown out of legitimate banking business. It may be different where the demands of existing creditors grow out of legitimate banking business, and provided the money expected to be raised is necessary and intended to be applied to discharge *bona fide* debts of that character. And where such a pledge and an assignment in trust has been made, and it is difficult, before proofs have been taken, to discriminate between the character, *bona fides*, and the legitimacy of the claims of creditors thereunder, it is the duty of the court to grant an injunction and appoint a receiver.

An unlawful transaction is not to be upheld merely because there has been honest intention and good faith in those who caused it. It must be judged by law and not by motive.

On the 15th of December, 1840, the North American Trust and Banking company issued 800 promissory notes, all of the same date, payable thirteen months thereafter, in favor of their clerk, who indorsed them, not for the purpose of adding anything to their security, but to give them currency without further trouble. Four hundred of them being $500 each and the remaining four hundred for $1,000 each (amounting in the aggregate to $600,000.) At the foot of each note was this memorandum: "The payment of this obligation, with others, amounting in the aggregate to $600,-000, is guaranteed by the transfer of securities estimated at $800,000, under a deed of trust executed between the company and H. Y., T. G. T. and W. C. N. Trustees, bearing even date herewith." These notes were delivered out principally to directors and agents to raise money and bring it into the association. *Held*, that these notes had so far the character of circulating notes as to be within the restraining law of 1830, (1 R. S. 712) and the act of May 14, 1840, and were consequently illegal. Also that they were void from the fact that they were not based on the pledge of securities with the comptroller nor intended to be countersigned and regis-

tered as required by the banking law. Likewise that, the notes being void, the accompanying trust deed, made for their security and payment, had no legal effect and was void. *It would seem* also that such trust deed was fraudulent in law as tending to hinder and delay creditors. Still it might be that creditors dealing with the company in legitimate banking business and induced to accept some of these notes on the strength of the trust, at the same time relinquishing other securities, would be remitted to their original rights and securities. No protective equity, however, attached in favor of parties on the ground of their having bought and paid for exchange or made loans or advances of money or assumed liabilities for the company, or given up its certificate of deposit on the strength of having received, as security, the notes and the trust merely on the faith of the security the latter was intended to afford. But, if the parties, on taking the notes, had been expressly promised or had expressly stipulated for a pledge or hypothecation of bonds and mortgages or other securities, as collaterals, (the notes proving to be illegal and void) they might insist on a fulfilment of the stipulation in respect to to the pledge by way of equitable mortgage; and the court, on proof, which must not be feeble, would compel a restoration as a condition of annulling the new security.

And, on this latter principle, where a *bona fide* creditor of the association had had bonds and mortgages assigned to him as security, and was encouraged to give up such bonds and mortgages and take some of the said notes embraced by the said trust-deed on an urgent assurance from the president (and the being shown a written opinion of the counsel of the association) that such notes were valid and well secured by the trust deed, and the said bonds and mortgages still remained as part of the assets embraced by the said trust and had not been passed away. *Held,* that such creditor, (the court deciding against the trust deed) was entitled to a restoration of the bonds and mortgages.

Where a trust deed, made by a banking association with a view to protect the holders of its certificates, is set aside, a holder who was induced to take some of them and give up bonds and mortgages which the association had before transferred to him as security for indebtedness, and this was done at the request and upon the earnest assurance of the association of the validity of such trust-deed and certificates, and an opinion of counsel was shown by way of further inducement. *Held,* that the holder was, through his answer, entitled to have the bonds and mortgages restored to him without the necessity to file a cross-bill.

Trustees of an invalid trust, who reasonably defended it but who were cognizant of all the transactions out of which its invalidity arose, decreed to bear their own costs.

The right of a banking association to purchase state stocks attaches only when the object is to effect a deposit or pledge of the same for circulating notes, or, if for any other purpose, it should be the investment of capital or surplus funds for the sake of interest. It should not be done on credit and by a deposit of their securities and for speculation with a view to profit.

Nor can such an association purchase upon credit (not for an investment) depreciated paper of the banks of other states at a discount, with an intention to re-sell the same at an expected profit or to be laid out in cotton at the South to be shipped to Europe.

1843.

LEAVITT
*v.*
YATES.

Nor can such an association, especially while it is in pecuniary difficulties, buy up, with its own bills of exchange, shares of its own capital for the purpose of being sold again and, in the mean time, of being used as a means of raising money.

The revised statutes, on the subject of preventing the insolvency of monied corporations and to secure the rights of creditors and stockholders, apply to associations under the general banking act of 1838.

Trust-deed set aside on the complaint of a receiver: as the court considered the trustees so placed that they could not well do otherwise than defend it, and yet, as the fact was that they were not strangers to the transactions out of which it arose and accepted the trust knowingly, they were decreed to bear their own costs; and the receiver was allowed his costs out of the fund.

---

*Dec.* 4, 5, 6, 9, 10, 11, 1843.

*Bank. Banking Association. Corporation. Directors. Assignment. Trust Deed. Fraud. Equitable Mortgage. Pleading. Cross Bill. Costs. General Banking Law. Receiver.*

BILL filed to set aside a certain trust deed or instrument in writing, bearing date the fifteenth day of December, one thousand eight hundred and forty, executed between the North American Trust and Banking Company of the first part, and the defendants, Henry Yates, Thomas G. Talmage and William Curtis Noyes, as trustees of the second part; and to have the securities transferred to the said trustees, by means of the said instrument for the purpose of securing the payment of certain notes of the said company, delivered up to the complainant as receiver of the effects of the said company.

The bill alleged that the complainant was informed and believed that, in the latter part of June or the beginning of July, one thousand eight hundred and thirty-eight, articles of association were entered into by certain persons to carry on the business of banking, under the act in that case made and provided, passed 18th April, 1838. That the name assumed was *The North American Trust and Banking Company:* that the association was regularly organized under the act and by articles of association; and commenced the business of banking, until enjoined by the court of chancery. That, by an order of the court in the case of *George M. Tracey* v. *Thomas G. Talmage,* president of the North American Trust and Banking Company, the company, its officers and agents were suspended from exercising any rights, privileges or franchises; and it was ordered that a receiver should be appointed and the company, its officers and agents should deliver over all the property and effects, &c. That, pursuant to the act respecting the appointment

of receivers of monied institutions, passed 27th April, 1841, and to the above mentioned order and by a further order the complainant was appointed receiver; and had accepted the trust, &c., under the control of the bank commissioners, by whose direction this suit was instituted. That, on or about the twelfth day of October, in the year one thousand eight hundred and forty-one, the company and its officers assigned and delivered over the property, &c., to the complainant as such receiver. That, an agreement was made between Thomas G. Talmage, President of the said association, for and in behalf of the said association, of the first part and the defendants, Henry Yates, Thomas G. Talmage and William Curtis Noyes of the second part; and that there was annexed thereto a schedule of the bonds, properties and effects embraced thereby, as well as the blank form of proposed promissory notes or obligations to be issued thereunder.

That the bonds, properties and effects mentioned in this schedule were, in fact, delivered to the trustees and have been and are now retained by them under color of the said instrument; and that Thomas G. Talmage, as president, executed assignments of them. That the book of minutes of the proceedings of the board of directors set forth a meeting of the board on the fourth day of January, one thousand eight hundred and forty-one and a resolution then passed to create a new trust, authorizing the officers to select the securities and place them in the hands of the said defendants, Yates, Talmage and Noyes, and to execute the necessary papers prepared by the counsel to carry said trust into effect. That the meeting was not a regular quarterly meeting nor any meeting provided for by the articles of association or bye-laws; that it did not appear from the said minutes by whom or in what manner it was convened or that the notices were given as required by the bye-laws and the bill. Charged that the meeting was irregular and the proceedings illegal and void; and insisted, that there was no other resolution in the said minutes nor any other authorizing the making of the said agreement or the delivery of the said property or the issuing of any notes under it. The bill also showed, that eight hundred bills or notes, purporting to be made by the said association, were issued or put in circulation by the

association or its officers or agents about the time of making the said instrument in writing of even date with the same, payable to the order of Elam H. Gibbs in thirteen months with seven per cent. interest, and that four hundred of them were for a thousand dollars each, and a like number of them for $500 each, making, in all, six hundred thousand dollars, and that copies of the notes are annexed.

The following is the form of one of such notes, (those made out for $1,000 each were exactly similar.)

*New York, December 15th, 1840.*

$500 *dlls. No.*

*Thirteen months after date the North American Trust and Banking Company promise to pay at their Banking House to the order of Elam H. Gibbs for value received, the sum of five hundred dollars, with interest thereon at the rate of seven per centum per annum.*

*Thomas G. Talmage,*
*President.*

*D. E. Tylee,*
*Cashier.*

☞ *The payment of this obligation with others amounting in the aggregate to $600,000, is guaranteed by the transfer of securities estimated at $800,000, under a deed of trust executed between the Company and Henry Yates, Thomas G. Talmage and William Curtis Noyes, trustees, bearing even date herewith.*

Also, that the said notes or bills were endorsed in blank by Gibbs, before being issued; that Gibbs was a clerk in the bank, but the notes were not made payable to him for the purpose of paying any indebtedness of the association to him, nor received by him for any *bona fide* or valuable consideration: but were so made payable and indorsed solely for the purpose of making them negotiable and transferable by selling as if they had been made payable to bearer. That Gibbs was insolvent; and did not endorse them for security. That there was no resolution of the directors authorizing the issuing of the said notes, but the one

passed on the fourth day of January, one thousand eight hundred and forty-one. The bill charged that they were not issued by virtue of any resolution or authority of the board of directors. Also, that the trust agreement was made and the property under it delivered solely for the purpose of securing the holders of the said bills or notes. The complainant submitted that the issuing, &c. of the notes or bills was illegal and contrary to an act to amend the act entitled "An act to authorize the business of banking," passed the 14th day of May, 1840, and contrary to the act to authorize the business of banking; and that the bills were void and all conveyances connected with them. He also insisted that the bills were not delivered to the company by the comptroller or secured by the pledge of property with him, nor countersigned or registered in the comptroller's office; and that the issuing was an illegal attempt to evade the general banking law. Also, the bill charged that when the said instrument in writing was made and the said notes, &c. were issued, the North American Trust and Banking Company were insolvent and had long before been embarrassed and unable to meet its pecuniary engagements without extensions and sacrifices and borrowing money by unusual means. Also, that the said company had long before the said fifteenth day of December, one thousand eight hundred and forty, in order to pay its debts or obtain extensions or renewals, transferred to trustees about two million five hundred thousand dollars of its bonds and mortgages received for stock or certificates or debts or discounted. Also, that about three-fourths of the capital stock was so assigned to secure the payment of three separate sets of bonds dated February, one thousand eight hundred and forty; and payable, one million five hundred thousand dollars on the first day of February, one thousand eight hundred and forty-five and five hundred thousand dollars on the first day of February, one thousand eight hundred and forty-seven; and that the said bonds were made to procure money to meet debts incurred by losses which the company could not meet in the regular course of business or to aid in extensions or renewals; and that but a small portion of the moneys raised from them was used in

1843.

LEAVITT
v.
YATES.

the banking.   That the company was prevented from sus-
pension and open and public insolvency by the said resort
to unusual means to raise money ; and that it was, several
times, on the eve of suspension before making the said in-
strument in writing ; and particularly in July, one thousand
eight hundred and forty.   That the said instruments in
writing and the notes or bills issued under it were made to
meet some outstanding debts or to raise money to pay the
same or to obtain a further renewal or extension of the same
and not in the regular course of the business of banking or
for the purpose of banking, &c.   That at and before the
issuing of the said notes and before the said fifteenth day
of December, one thousand eight hundred and forty, the
said association was insolvent ; and that the said instru-
ment in writing was made and the said notes paid out and
delivered and the said property conveyed to the said trustees
when the said company was insolvent or in contemplation
of insolvency, with the intent to give a preference to some
particular creditor over other creditors and was so received
by the said trustees ; and that there were other creditors,
to a large amount, whose claims were not secured by the
same.   That nearly all the property and effects, remaining
in the hands of the directors, were embraced and de-
livered over in and by said instrument in writing.   That
the company had no considerable remaining capital or
means adequate to carry on the business of banking ; but
was deprived of the same and disenabled to carry on the
said business of banking by means of such transfer.   Also,
that the security of the creditors of the company not there-
by provided for was impaired by the said transfer : the pro-
perty and effects not being under the control of the direc-
tors chosen by the stockholders or provided for by the said
act to authorize—and that said transfer and delivery was
illegal and not authorized by the articles of association or
bye-laws.   That the nominal amount of the property so set
forth was about one million of dollars ; but that it was es-
timated at the time at eight hundred thousand dollars.
That the said trustees had not given any security, &c. ;
that they were not responsible to the amount thus commit-
ted to them.   And that Talmage and Yates were among

the original associates who formed the said association and were elected in the first board of directors. That the defendant Yates was chairman of the committee of investments and finance from its organization in July, one thousand eight hundred and thirty-eight, up to the month of August, one thousand eight hundred and forty ; that the defendant Talmage was chosen a member of the said committee about the thirteenth day of August, one thousand eight hundred and forty, and acted as such until the resignation of Yates on the fifth day of August, one thousand eight hundred and forty, as chairman, when Talmage was elected chairman ; that Talmage was vice-president and was elected president in the latter part of one thousand eight hundred and forty, and continued to act until suspended and enjoined. Also, that all the trustees had full knowledge of all the matters before alleged so far as they in any manner affected the said trust. That the said property and effects were, by the said instrument in writing, held by the said trustees for the holders for the time being of the said notes or bills of the said company respectively, according to the amount held by each individual after default in payment and the said property and effects were, by the said instrument in writing, to be realized or collected and the proceeds paid to such holders so as to discharge the said notes if sufficient and if not sufficient for a payment in full, then, in rateable proportions. That there was no power given to the said trustees to discriminate between *bona fide* holders or holders for full value and such as hold the said notes as collateral or without consideration or for a partial or illegal consideration ; nor had the said trustees any power to adjust or ascertain the amount or legality of any demand set up by the holders of the said notes or bills against the said company or to refuse payment of any part of the notes held for the time being by any person in case the amount were greater than what was actually due.

The bill then set forth the present holders of the notes, so far as they were known ; and among these were the defendants Messrs. Palmers, McKillopp, Dent & Co., The Bank of the United States, The Girard Bank, William Vyse, De Launay & Co., Ezra Clark and The Fund Commissioners

1843.

LEAVITT
v.
YATES.

of Illinois. And the complainant stated his fears that the property in the hands of the said trustees would be paid in part to persons who had no legal claim against the said association or no claim to the amount of the notes held by them and to insolvent persons from whom it could not be recovered, &c. or that the receiver would be put to trouble and expense in recovering the same. Also, it was alleged that there were other respects in which it would be inequitable and unjust to the other creditors and to the stockholders and receiver to apply the said trust funds to the payment of the holders for the time being of the said notes. Also, that some of the notes were delivered to S. D. Dakin, an agent, to raise money ; and no full or complete account had been rendered by him. Nor did it appear from the books of the company nor had the complainant any knowledge whether the said notes, committed to said agent, remained in their hands or had been parted with and put in circulation. Also, that the said notes were none of them issued on the day they bore date, but at different times thereafter, yet bore interest from their date and it appeared from the books that the said interest was not in many cases accounted or allowed for when they were issued. That in the months of May, June and July one thousand eight hundred and forty-four a quantity of the said notes, to the amount of seventy-six thousand five hundred dollars or thereabouts, were returned or repaid to the said association in the course of business and that all of the said notes or bills so returned were afterwards, but at what particular time was to your orator unknown, reissued or again put in circulation by the said association or its officers, so that none remained on hand or came into the complainant's possession as receiver, except two of the said notes or bills for five hundred dollars each. That the bills would become due on the fifteenth day of January one thousand eight hundred and forty-two and that the receiver had not funds and had no prospect of obtaining any to pay them even if he ought so to do. That the assets of the company were represented in the annual statement under oath of the president on the fourth day of July one thousand eight hundred and forty-one as follows :

| | | |
|---|---|---|
| Real estate belonging to the association | $13,450 00 | |

*Shares of stock held absolutely :*

| | |
|---|---|
| State Stocks at par . . . . | 1,755,040 00 |
| Other stocks valued at . . . | 48,250 00 |
| | $1,803,290 00 |
| Amount of debts due the association | $5,580,251 37 |
| | $7,396,991 37 |

And the debts of the company as follows :

Amount of debts due from the associa-
tion . . . . . . . $4,652,665 41

And that the assets which came into the hands of the receiver were of little value. That it was morally certain that default would be made in the payment of the said bills ; and that the duties and powers of the trustees consequent thereon would take effect. That the complainant was advised and insisted that the said defendants, trustees, were officers and agents of the said association and were, under the order of the court aforesaid, restrained and ought to have delivered over the said property and effects to the complainant on his appointment as receiver. Also, that if the said trust be not wholly illegal and void, but be held good for any purposes, the said trustees should be removed and the complainant be substituted, as they are not officers known to the law and have a compensation not fixed by law and have no power to adjust and compromise ; whereas the complainant is the officer appointed to liquidate the affairs of the said company under the direction and advice of the bank commissioners.

That the bill also showed that the said Yates, &c. (trustees,) had already collected considerable sums ; and were proceeding to collect and foreclose and also promised to declare a dividend in January one thousand eight hundred and forty-two. That the principal management of the business was in the hands of the defendant Talmage ; and that Yates was a holder to a considerable amount of the said bills issued under the trust. Also, that twenty-nine thousand dollars are not accounted for in the books, &c.

1843.

LEAVITT
v.
YATES.

*Prayer :* That the instrument in writing and all assign-- ments or agreements pursuant thereto might be decreed null and void and be discharged of record. Also, that the said trustees might be forthwith ordered and finally decreed to transfer and convey, on oath, before a master to the receiver, all the property and effects received under the said trust remaining in their possession; and execute all proper in- struments and deliver over all property received in ex- change or payment or in satisfaction of any of said trust or effects. Also, that they might account for all monies, properties and effects received by them at any time through or by means of the said instrument in writing on oath be- fore a master and might assign and transfer it to the re- ceiver. And that if it should appear, on such accounting or otherwise, that the said trustees had paid out or parted with any of the said property or its proceeds, that they might account for and pay over, in money, the full value of the property so parted with and make good any defi- ciency in the said trust funds. That they may deliver over all title deeds, vouchers, &c ; and that they might discover and set forth the present holders of the said bills or notes at present unknown to your orator, so that they may be made parties to this bill. Also, that if the said instrument in writing should not be declared void, that, then, the said trustees might be removed and the complainant be substi- tuted. And that the said trustees might be forthwith sus- pended from their powers, privileges and franchises ; and be enjoined and restrained from exercising them. Also, that they might be enjoined from selling, transferring, &c. any of the said property, except to the complainant as such receiver; and from destroying, cancelling, discharging, &c. any of the same. And from collecting or recovering any money on account of the same or foreclosing, &c. And from paying over any monies, effects, &c. to any of the holders, &c. And that the receiver, complainant, might be substituted in all suits brought by them. Also, that the complainant might have a reference, with leave to examine the defendants and others on oath respecting any property in their possession or in regard to papers, &c. And also, gen- eral relief.

The trustees and different holders of the notes were made defendants.

The defendants, the trustees, by their answer, admitted *inter alia* that the meeting at which it was resolved to form this trust, was not a quarterly meeting or one expressly provided for by the articles or bye-laws and that it did not appear, by the minutes, by whom it was convened. But that the bye-laws gave power to the president to call such said meeting and that the cashier or second cashier should sign the notices and eleven directors would have to form a quorum. Averment, that the said meeting was directed by the president and that notices were issued by the second cashier and transmitted to directors; and that fourteen directors (named) attended and voted the adoption of the preamble and resolution set forth in the bill. Also, that the said meeting was regular and the proceedings valid. The defendants admitted that there was no minute of any vote authorizing the said instrument or the delivery of the said property to the said trustees or the issuing of the said obligations as stated, save the said preamble and resolution of January the fourth one thousand eight hundred and forty-one. They admitted that no other resolution ever authorized the said agreement or the delivery of the property or the issuing or circulation of the notes; but insisted that this resolution and preamble did authorize fully the said agreement and the transfer and making and issuing said obligations. Admitted that the eight hundred obligations were made and signed as set forth and described; but denied that they were put in circulation as charged or as money, or to answer the purpose of circulating notes, or loaned or used as payment or in any way circulated or used as exchange. They admitted that Gibbs was a clerk and that the said notes were not made payable to his order or delivered to him in payment of any indebtedness; nor for a valuable or any consideration. But they denied that they were made payable and delivered to Gibbs in pursuance of any agreement as stated or to make them negotiable by delivery merely. They admitted that Gibbs was not a man of much property and that his endorsement was not procured to increase the security of the notes; but as

to his being wholly irresponsible, they left complainant to his proof. They admitted that the said minutes contained no record of adoption of any resolution authorizing or in anyway relating to the said obligations, save the said reso-tion and preamble of January the fourth one thousand eight hundred and forty one ; and that no other way ever was adopted by the said directors ; but they insisted that the said resolution and preamble did fully authorize them. Also, that whenever any of the obligations should be de-livered to any other person as security for advances or lia-bilities or in payment of debts or pledged for valuable con-sideration, then, by means of said execution, transfer and delivery of property and also delivery of obligations and agreements accompanying each delivery, it was intended to convey and vest an interest in the said property to the said person or persons. And they denied that the said writing was executed or the property assigned by way of special indemnity or pledge for payment of principal and interest. They submitted that the making and using of the said obligations, in the manner set forth in their an-swer, was not contrary to any law or statute of this state, but were authorized by law and the articles and bye-laws ; and all acts done by means of the said instrument were legal and valid and binding on the association and on the complainant as receiver. They admitted that said obliga-tions were not furnished, registered or countersigned by the comptroller nor in any manner secured in conformity with the act to authorize the business of banking.

In reply to the charge of insolvency at the date when the said notes were issued, the defendants annexed a sche-dule, containing the result of the investigation of the com-mittee of five, dated October the 1st 1840, showing that the assets exceeded the debts of the said association by two million three hundred and twenty one thousand three hun-dred and ninety-five dollars and thirty-five cents, after de-ducting, for estimated losses, four hundred and fifty-six thousand eight hundred dollars, leaving the capital stock about seventy dollars per share. The defendants Talmage and Yates, from knowledge, and Noyes, from belief, further stated that its condition from the first of October one thou-

sand eight hundred and forty to the first day of January one thousand eight hundred and forty-one, (the date of said agreement and issue,) remained essentially the same; and that the said estimate of the committee was founded on the then fair market value of the stocks, property and demands and was a true statement of assets and liabilities; and, therefore, it was not insolvent, but had a surplus of property over its debts. The defendants admitted that the said association had purchased state stocks to the amount of more than four millions of dollars and also southern and south-western bills and had sustained losses by the depreciation of said stocks and bills; and that their means for carrying on business were diminished. They asserted that the directors and business men in general looked for a favorable change in business, revival in trade and higher values generally with the commencement of one thousand eight hundred and forty-one. Also, that the banking institutions of the country were expected to resume specie payments in January one thousand eight hundred and forty-one. Also, that as the said committee had reported the institution solvent, it seemed desirable to obtain temporary aid, in order to enable it to hold on through the year one thousand eight hundred and forty-one, in order to reap the benefits expected of increased prices. That instead of selling property in the then depressed state of the markets, it was deemed expedient to obtain funds by resorting to a pledge of its assets. That with a view of ascertaining whether loans could be obtained by pledge, a paper was prepared and signed, but the subscription was not to be binding unless four hundred thousand dollars was subscribed. Two hundred and forty-five thousand dollars was subscribed. That having obtained subscriptions to so large an amount, it was deemed advisable to execute the assignment and delivery of property, as stated, to the defendants and make the said notes and apply the said means —trusting that the whole sum required would be obtained— especially as the directors had verbal assurances from the subscribers that they would advance the sums subscribed at any rate. They denied any intent to violate or evade any law by any transactions or to act beyond their powers

or that the said notes were put in circulation as or used for money or issued in payment for notes discounted or to persons borrowing or as exchange. They denied that the agreement and obligations were executed to meet debts, raise money to pay them or to obtain extensions or renewals by pledging as collateral or otherwise except as before stated. They denied the insolvency of the institution or that, by transactions, any preferences were intended of one creditor over another or any unlawful purpose effected or intended. And they submitted that, even if the association were insolvent, their legal right would have been perfect to execute the agreement, give preferences and make assignments, transfers and pledges. They admitted that there were other creditors to a considerable amount not secured by those transactions, but much the larger part were thus secured by the said pledge made in connection with the construction of the debts. But that after the said delivery to the defendants, there remained upwards of seven hundred thousand dollars worth of property and residuary interests in the property pledged amounting to two million four hundred thousand dollars which would have enabled the association to continue its business but for the extraordinary depreciation of stocks and property and the general failure of banks and business. They admitted that the property so pledged was placed beyond the control of directors to the extent specified in the agreement and assignments and still remained so by virtue thereof. They admitted that the nominal amount of property assigned to them to be as charged, but were unable to estimate the then present value, because it was greatly depreciated. They admitted that they had given no security except what might be found in covenants. They neither admitted nor denied their irresponsibility compared with the amount of property committed to them; but they stated that they had considerable property or were in the receipt of income or were then free from embarrassment. They admitted that Talmage was one of the original associates and that Yates became so soon after it was formed; and that they were both among the first directors elected. That Talmage had for the greater part of the time and Yates constantly when in the city acted as direc-

tor until the injunction; and were also members and chairmen respectively of committee of investments and finance, but that Yates was absent from the city on the meetings and was only partially acquainted with the proceedings. That Talmage was vice-president prior to the twenty-eighth day of October one thousand eight hundred and forty, when he was elected president and so remained until the injunction was served. Also, that the defendants Talmage and Yates had full knowledge of its condition, affairs, articles, bye-laws and proceedings and a general knowledge of its means, resources, operations, creation of trusts and of the obligations or notes as admitted in their answer, but not otherwise; and that they had notice of the circumstances affecting the said trust when they accepted the same as therein stated. The defendant, Mr. Noyes, stated that he had never been a stock-holder or acquainted with its affairs or situation except from general report, and from communications made for the purpose of obtaining his legal opinion and advice; and that, at the date of the said agreement and acceptance of the trust by him, he had no knowledge of the solvency or insolvency, debts or assets, except from the report of the committee hereinbefore referred to, nor as to agreement and obligations other than what appeared thereon and that they proposed to raise money thereon for general purposes. Likewise, that he was not the legal adviser or in the habit of being consulted by the association, and only when called upon by and associated with their counsel John L. Graham; and that his opinions were always given in writing upon a statement of facts. Also, that, at the time of the execution of said agreement, he had seen the report of the special committee before referred to and supposed the association solvent and in possession of a considerable surplus; and that, at the time mentioned, he had no knowledge of its affairs or of the proceedings of its directors, committee or of its embarrassments, alleged insolvency or inability otherwise than as is therein set forth; and he left the complainant to his proof. The said defendants submitted that, by the terms of the said agreement in execution of their trust, they were bound to discriminate between *bona fide* holders of the said notes, and holders for partial or illegal consider-

ations or holders without consideration, and also that they were empowered to liquidate and settle the amount due and the legality of any claim set up by holders of the said obligations against the said association or trust funds, and to refuse payment whenever more was claimed than was due. In a schedule they set forth the names of the parties to whom said obligations were originally delivered; and in another schedule the names of the present holders as far as they were known. These defendants also stated, on information and belief, that J. B. Murray held from twenty-two thousand five hundred dollars to thirty-two thousand five hundred dollars of the said obligations; two thousand five hundred dollars of which were given to him for his note subsequently paid by him, and the residue was received by him for services in Europe as agent for the said association. The defendants respectfully submitted that it would not be unjust to other creditors, stock-holders or to the complainant as receiver, to apply the property to the purposes specified in the trust agreement. But that it would be unjust to deprive the holders of these obligations of their vested rights. They admitted that, at various times in May, June and July, one thousand eight hundred and forty-one, obligations, to the amount of seventy-six thousand five hundred dollars were returned to the said association and again delivered to other parties as collateral security for loans made on the credit thereof and in payment of debts, so that but two of the said notes for five hundred dollars each, numbered 434 and 596, came into possession of receiver. They submitted that there was no reason why these trusts should be withdrawn by this court, as the defendants were selected and approved, both by the association and those intended to be interested therein; and their conduct, thus far, was satisfactory. Also, that the execution of their duties did not conflict with the proper duties of complainant. The defendants stated that they had collected some moneys and were collecting more by foreclosure suits, and should take further means to realize by sale or otherwise; and denied any intention to make a dividend, or that they ever declared any such intention. They admitted that Talmage was principal manager, but said that he was so under constant super-

vision of the others.   They admitted that they declined to cease from acting as trustees ; and they insisted that the said instrument was valid and binding upon all the parties ; and conveyed all necessary powers on defendants.   Also, that the said notes or obligations were legal and valid and evidences of debt.   And, that by means of the said transfer and de-livery of obligations, the said property became pledged for the payment of the respective sums due to the persons to whom they were delivered.   That the said notes or obliga-tions were delivered as evidences of debt and as evidences of pledge, and as evidences of delivery ; and were not put in circulation as money, but were simply contracts for pay-ment of money guaranteed by pledge and made negotiable for convenience and for the purpose before stated.   Also, that in all cases of loans, the amount of obligations deliv-ered agreed precisely with the sum loaned, and, so, when received in payment of debts: and admitted that when parted with as security collateral to business promissory notes of this said association that they were transferable by delivery and the payee had no interest therein in any way. And they denied that they were issued or intended as circu-lating notes ; or endorsed for the purpose of enabling them to have a circulation as bank notes or money : for they then had a circulation countersigned and secured in the usual way under the general banking law.   They denied that, on the fourth day of January, one thousand eight hundred and forty-one, the said association was insolvent or that the said agreement was made and the effects transferred when insol-vent or in contemplation of insolvency and with intent to give preferences ; and charged the facts to be as thereinbefore set forth.   They submitted that even if the obligations were adjudged void, the moneys advanced, liabilities assumed and debts for which they were given as collateral securities should be paid from the said property by reason that a lien then existed in virtue of such transactions.   That even if the agreement were declared void and the property directed to be given up, it ought not to be so, save on terms of paying the amounts loaned and advanced and amounts due to indi-viduals for liabilities incurred as aforesaid, and amounts due to those who took such obligations for debts due and relin-

quished other securities of value. They averred that they had no knowledge of any illegality in the said meeting of the fourth day of January one thousand eight hundred and forty-one, nor in the said notes, nor were they aware of any want of authority on the part of the president and directors to make the said instrument. The said defendants admitted that before the creation of the said trust, and particularly in May, June, July and August in the year one thousand eight hundred and forty, the association was embarrassed in its pecuniary concerns; but did, up to the time and after the execution of the said trust deed, meet and pay all its debts and liabilities, except such as were postponed by agreements with the creditors. That, before the execution of the said trust-deed, the said association had obtained extensions of some of its debts, and had also made loans by sale of bonds and otherwise, which loans had been negotiated at considerable expense and, in some respects, upon unfavorable terms for the association. The defendants also admitted that, at special times during the progress of the business of the association, before the time of the execution of the said trust deed, it was ascertained that liabilities of association were shortly to mature, and to meet which there was not a sufficient amount of money immediately available on hand, and that in or about July, one thousand eight hundred and forty, a very large amount of liabilities matured, which the association had not available means to pay; and that, on such occasions, and particularly on or before the first day of July, one thousand eight hundred and forty, the officers of the association were obliged to resort to loans, sales of property, &c., to provide available funds to meet such payments. And the defendants said, that unless the officers had made such provision, a suspension of payments must have ensued.

The defendants, Palmers, Mackillop, Dent & Co., in and by their answer, stated that they held eighty-seven notes secured by Yates's trust deed. The defendant, John Horsley Palmer, one of the said firm, stated that the North American Trust and Banking Company being indebted to Palmers, Mackillop, Dent & Co. in a large sum, for moneys paid to the association and by accepting and paying bills drawn by such association on the said firm and for which such firm held col-

lateral securities, the said association, in July, one thousand eight hundred and forty, assigned to the said Palmers, Mackillop, Dent & Co. one hundred and twenty-five bonds each for two hundred and fifty pounds sterling and agreed to assign other bonds, the whole amounting to forty-five thousand pounds sterling, as security for the balance due the said firm and for accepting bills which the association proposed to draw on the said firm, to the amount of fifteen thousand pounds sterling. That it was represented to the said firm, that the said one hundred and twenty-five bonds, &c., were secured by an assignment of bonds and mortgages in trust. That, at or after the said one hundred and twenty-five bonds were placed in the hands of the said firm, the association, without previous advice, drew seven bills of exchange on the said firm and sold the same in New York, which were drawn by the president to the order of and endorsed by the cashier, dated July 31st, 1840 and one other bill of exchange dated August 8th, 1840, the whole amounting to ten thousand two hundred and fifty-seven pounds, seventeen shillings and four pence sterling. That Palmers, Mackillop, Dent & Co. accepted a portion of bills, dated July 31st, 1841, amounting to seven thousand five hundred and seventy-three pounds fifteen shillings and two pence sterling; but when they ascertained that other bills, to the amount of seven thousand five hundred pounds, had or would be drawn by the association, the said firm were, at first, unwilling to accept the same and so informed James B. Murray, the agent of the association, who thereupon exhibited a statement, showing the ability of the association to meet its engagements; and on or about the third day of September, one thousand eight hundred and forty, he agreed with the firm that if they would accept the bills of the association drawn subsequent to the first day of August, one thousand eight hundred and forty, to the amount of seven thousand five hundred pounds, &c., he would engage that the association should deliver such approved securities to the order of the said firm as would enable their agent to remit to them fifteen thousand pounds sterling, drawn and believed to be drawn by the association on the said firm against the said one hundred and twenty-five, and said other bonds amounting to forty-five

VOL. IV.—20

thousand pounds. That it was agreed that the said one hundred and twenty-five bonds, &c., should be returned to the association upon the association delivering the said approved securities, &c. That, thereupon, the said firm agreed to accept such bills according to the said agreement; and that the said Murray gave an order to the said firm on the association for the said approved securities, &c. &c. That, after the making of the said agreement, the said bill of exchange, dated August 8th, 1840, for two thousand six hundred and ninety-four pounds, two shillings and two pence, was accepted and paid by the said firm ; but the association drew no more bills against the said bonds. That Melville Wilson, shortly afterwards and on behalf of the said firm, brought the said bonds to New York and was authorized to obtain the said securities, &c., to remit to Palmers, Mackillop, Dent & Co., to reimburse them for the payment of the said bills (amounting to ten thousand two hundred and sixty-seven pounds, seventeen shillings and four pence.) That, thereupon, the said association induced the said Melville Wilson to agree to receive the said seventy-seven notes secured by "Yates's trust," each dated December 15th, 1840 : twenty-seven being for two hundred and six pounds each, and fifty for one hundred and three pounds each, amounting to fifty-two thousand dollars or thereabouts. That the said Wilson thereupon agreed to receive the said notes subject to ratification by the said defendant's firm. That the said notes were taken by the said Murray to London; and on the third day of March, one thousand eight hundred and forty-one, the said firm confirmed the said agreement made by Wilson and received the said seventy-seven notes as collateral security for the payment of the said sum of ten thousand two hundred and sixty-seven pounds, seventeen shillings and four pence and agreed to deliver up the said one hundred and twenty-five bonds, &c., and the same were delivered to the association, &c., and the residue of said bonds which had been promised the said firm were countermanded. The said defendant John Horseley Palmer answered that said James B. Murray, being indebted to the said firm in the sum of ten thousand pounds and being the holder and owner of ten of the said notes of association, each for two hundred and six

1843.

LEAVITT
v.
YATES.

pounds, numbered from 111 to 121, some time in June one thousand eight hundred and forty-one and before the same became due, delivered them to the said Palmers, Mackillop, Dent & Co. in payment of the said indebtedness. That, as to the manner in which the said James B. Murray became the owner of the said notes, the said defendant Palmer stated that the said Murray originally received from the association from twenty-two thousand dollars to thirty-two thousand dollars of the said notes for monies paid and services rendered for the association before or after January one thousand eight hundred and forty-one.

The defendants, Victor and John B. DeLaunay, constituting the firm of DeLaunay & Co. of New York, also members of the firm of DeLaunay & Co. of Havre DeGrasse, France, bankers, in and by their separate answers said that they then held certain of the said notes (setting them forth) amounting to fifty-five thousand dollars.

And the defendant Victor DeLaunay answered that he and I. B. DeLaunay had been many years prior to the time thereinafter mentioned engaged in business in New York &c. and were in the habit of drawing and selling bills of exchange on Paris; and that on the sixteenth day of April one thousand eight hundred and forty-one this defendant and I. B. DeLaunay sold and delivered to the said North American Trust and Banking Company nineteen negotiable bills of exchange drawn by the said firm in New York on the firm in Havre DeGrasse, payable at Paris sixty days after sight, for different sums, amounting in the aggregate to two hundred and fifty-three thousand and twelve francs and eighty-six centimes. That the association, at the time of receiving the said bills of exchange, agreed to provide for the same as thereinafter mentioned; and, as a security for the performance of such agreement, they agreed to and did deposit with this defendant sixty-four Arkansas bonds for one thousand dollars each, as well as said twenty of the said notes for one thousand dollars each, and other twenty made out for five hundred dollars each, and also a promissory note of the said association for thirteen thousand dollars payable thirty days after date and which note, if paid, was to be invested in a bill of exchange on Paris and ap-

plied in part fulfilment of the said agreement. That the said bills were drawn by the defendants firm on the faith of the said agreement and security. That the said defendant Talmage, the president &c., on receipt of the said bills and on the sixteenth day of April one thousand eight hundred and forty-one signed a paper, acknowledging the receipt of the said drafts of Messrs. DeLaunay & Co. and promising to return the same in fifty-five days from the date thereof in similar drafts adding interest at seven per cent. having deposited with them as collateral security aforesaid Arkansas bonds and forty notes of the association and therein giving full authority to sell the same immediately after the maturity of the contract in case of the non-fulfilment of the same. Also that as a further security the said association deposited with DeLaunay & Co. the note of the said association for $13,000 payable thirty days after date, and which note, if paid, was to be invested in a bill as aforesaid. That the said association negotiated the said nineteen bills and the same were accepted and provided for by V. & I. B. DeLaunay ; but the association did not return the amount of the said bills in drafts or pay the said thirteen thousand dollar-note. That the association, with the consent of this defendants' firm, sold twenty-five of the said Arkansas bonds ; and purchased drafts and remitted them to meet, in part, the said nineteen bills and by which the amount due to the said firm was reduced, on the sixteenth day of June one thousand eight hundred and forty-one, to one hundred and sixty-seven thousand nine hundred and ninety-five francs, twelve centimes. On which day it was agreed that, on the receipt of bills by this defendant from the association for the said last sum, the said DeLaunay would renew the said credit, by delivering to the association another sett of bills to the amount of one hundred and fifty-thousand francs upon the security of the remainder of the said Arkansas bonds and the said forty notes. That this defendant thereupon received from the association bills drawn by various persons, amounting to one hundred and sixty-seven thousand nine hundred and ninety-five francs and twelve centimes, and delivered to the association twelve other negotiable bills drawn by DeLaunay & Co. in New York on DeLaunay

& Co. in Havre, payable at Paris sixty days after sight and amounting to one hundred and fifty thousand francs. The association agreeing to provide for the said bills substantially as on a former occasion and depositing with this defendant the remaining thirty-nine Arkansas bonds and the said forty notes as security &c., (and the said forty notes were still held by this defendant) and he, this defendant, delivered up to the association the said note for thirteen thousand dollars. That the said DeLaunay & Co. drew the said twelve bills on the said thirty-nine Arkansas bonds and the said forty notes as security therefor. That these defendants had no notice of and were not responsible for the improper use of the said bills by the association; and they charged that the proceeds of the same were applied by the association in regular banking business. That the said twelve bills were negotiated by the association and accepted and taken up by or on behalf of this defendant. That the association did not return the amount of the said twelve bills at any time in similar drafts or otherwise, except that the association, with the consent of the defendants' firm, sold fourteen of the said Arkansas bonds and purchased drafts and remitted the same to DeLaunay & Co. at Havre and by which the amount due to the defendants' firm was reduced, on the eighteenth day of October one thousand eight hundred and forty-one, to one hundred and five thousand two hundred and thirty-three francs and seventy-two centimes, equal to, exclusive of exchange, nineteen thousand five hundred and seventy-two dollars and forty-seven cents, which, with interest from the last mentioned day, remained due and unpaid to this defendant and I. B. DeLaunay. That the said Victor and John B. DeLaunay then held twenty-five of the said Arkansas bonds and also the said forty notes; and this defendant claimed to be entitled to the payment of the balance due to his said firm, out of the property assigned to Messrs. Yates, Talmage and Noyes. The answer of I. B. DeLaunay corresponded with the answer of Victor DeLaunay.

The defendant, Ezra Clark, in and by his answer, said that he then held six of the said notes secured by Yates trust deeds (describing them) amounting to five thousand dollars. This defendant averred that he was a *bona fide*

1843.

LEAVITT
*v.*
YATES.

holder of the said bonds for value by him paid therefor to the association. That he first became a creditor of the association about the first day of December, one thousand eight hundred and forty, by purchasing its notes or certificates of deposit to the amount of five thousand dollars, paying cash therefor and at that time believing the same to be valid securities and his purchase was made in good faith. That about July the twentieth, one thousand eight hundred and forty-one, he was induced to give up to the said association the said certificates of deposit, and to take, in lieu thereof, from the association, the said notes (secured by Yates's trust deed) which he then held and he did so on receiving no other consideration therefor except the sum of two hundred and sixty-five dollars twenty-four cents for interest—being assured that the payment of such new bonds was secured by the assignment of property to trustees for that purpose.

The defendant William Vyse, in and by his answer, stated that he held a certain portion of the said notes secured by the said trust deed (describing them) amounting to seventy thousand five hundred dollars. That, besides large sums of money which the association borrowed of this defendant, amounting to more than forty-nine thousand dollars, the said association, by its president, knowing that this defendant was desirous of purchasing good bills to remit to his mercantile house in England, represented that the association were authorized to issue sterling bonds; and urged the defendant to purchase; and this defendant did purchase, on the twenty-eighth day of August one thousand eight hundred and forty, of the association exchange in sterling of the association in five bills of two thousand pounds each amounting to ten thousand pounds; and the defendant paid the association for the same the sum of forty-six thousand seven hundred and seventy-seven dollars and seventy-seven cents. Also this defendant stated that, on the first day of July one thousand eight hundred and forty, he had deposited cash with the association amounting to ten thousand dollars (but of this, five thousand dollars was merged in the said purchase of the said exchange) and was induced to loan such ten thousand dollars to the association; and also on the four-

teenth day of July was induced to loan the association ten thousand dollars ; to secure the payment of which twenty thousand dollars the association assigned to the defendant two bonds and mortgages—one for twelve thousand dollars made by John McVicar dated the twenty-third day of October one thousand eight hundred and thirty-eight and one for thirteen thousand dollars made by Thomas Fitch on the twentieth day of September one thousand eight hundred and thirty-eight. Also, that on the second day of January one thousand eight hundred and forty-one he loaned the association three thousand dollars and on the first day of February one thousand eight hundred and forty-one he also loaned the said association another three thousand dollars. That when the association sold him the said five sterling bills (for ten thousand pounds) they delivered to him one hundred of their bonds in favor of Messrs. Curtis, Graham and Blatchford as trustees, each for two hundred and fifty pounds sterling. That the said five bills of exchange were drawn on the firm of Messrs. Palmers, Mackillop, Dent & Co. in England ; and the defendant was informed that if the said five bills were accepted by them, then the said bonds were to be delivered to them. But said bills were dishonored and returned with the bonds to the defendant. That, after such loan and after such return and dishonor of the said bills, to wit, in January or February one thousand eight hundred and forty-one, this defendant was urged to deliver to the said association the said five bills, the said one hundred sterling bonds and the said bonds and mortgages of McVicar and Fitch and to take, by way of security for the indebtedness of the association to him of such amounts of forty-six thousand seven hundred and seventy-seven dollars and seventy-seven cents, ten thousand dollars, ten thousand dollars, three thousand dollars and three thousand dollars certain of the said notes issued under the said trust agreement. That he was reluctant to do this, but was strongly urged ; and relying upon the assurances of the president and the written opinion of counsel of the company that the notes were valid and well secured, he finally consented and gave up all and every the same (including the said two bonds and mortgages) and received the said trust notes, which he then

1843.

LEAVITT
v.
YATES.

held as the only security for the said sums of forty-six thousand seven hundred and seventy-seven dollars and seventy-seven cents, ten thousand dollars, ten thousand dollars, (less the said five thousand dollars merged in the said exchange) three thousand dollars and three thousand dollars.

During the pendency of the suit, the defendant William Vyse died, and his executor, Samuel Clapham, who was made a defendant in his stead, elected to stand on the answer put in by his testator.

The defendant Richard M. Blatchford, receiver of the Commercial Bank, New York, in and by his answer stated that he held thirty-eight of the said notes for one thousand dollars each. That thirteen thousand five hundred dollars were received by the said Commercial Bank as collateral security for thirteen thousand four hundred and seventy-eight dollars and fifty cents loaned by the said bank to the said association upon the said notes or obligations and which was then due. Fifteen thousand dollars of such obligations were received for that amount of money loaned by the bank on the sole security of the said obligations, and that the same was then due and owing. That the said notes or obligations, to the amount of eighteen thousand dollars, were received by the said bank as security for sixteen thousand dollars loaned and the same was due. This defendant insisted that the association was indebted to the full amount of the last mentioned notes. Also he showed that the residue of the said obligations, amounting to thirty-four thousand dollars, were delivered to the said bank as security for a liability assumed by it for the said association, which the defendant did not admit but the same might be established.

There were other defendants also who put in answers.

The case first came before the court on a motion for an injunction against the trustees and for a receiver of the properties in their possession.

Mr. *Titus*, Mr. *Bidwell* and Mr. *G. Wood*, for the complainant.

Mr. *Noyes* and Mr. *Foote*, for the trustees.

Mr. *Charles Edwards*, for the defendant William Vyse.

Mr. *A. Mann*, Jr. for the fund commissioners of Indiana.

Mr. *B. F. Butler*, for Messrs. Palmers, McKillopp, Dent & Co.

Mr. *F. B. Cutting*, for Messrs. De Launay & Co.

1843.

LEAVITT
*v.*
YATES.

THE VICE-CHANCELLOR :—The object of the bill in this cause is to set aside a trust deed of assignment, purporting to have been made by or on behalf of the North American Trust and Banking Company, on the 15th December, 1840, to the defendants Yates, Talmage and Noyes, to secure the payment of an issue of eight hundred promissory notes of the company, all of the same date with the deed and payable thirteen months thereafter—four hundred of them being for the sum of $500 each and the other four hundred for $1000 each with interest at seven per cent, amounting in the aggregate to six hundred thousand dollars. At the foot of each note is a memorandum in these words : " The payment of this obligation, with others, amounting in the aggregate to $600,000 is guaranteed by the transfer of securities estimated at $800,000 under a deed of trust executed between the company and Henry Yates, Thomas G. Talmage and William Curtis Noyes, trustees, bearing even date herewith."

The trust deed alluded to is the one in question in this cause.

The bill undertakes to invalidate the deed and the notes connected with it on several grounds ; and it seeks to have the property and securities thereby assigned delivered to the complainant as receiver, appointed by the court of chancery, of all the property and effects of this broken down institution as being part of the assets which should come to his hands ; or if the trust deed shall be deemed valid, then to have the trustee therein named removed and the complainant substituted as trustee under it. And the bill prays an injunction to restrain the trustees from exercising any of the powers which the deed purports to confer upon them.

A motion has been made upon the bill and the answers

*March* 26, 1844.

of several of the defendants for an injunction to that effect and also for the appointment of a receiver to take charge of the property *pendente lite.*

This motion has led to a very full discussion by the able counsel engaged in the cause as well on ,the part of the complainant and of the trustees as on the part of other defendants who happen to be holders of a large number of the notes provided for and intended to be secured by the trust deed. The argument has embraced all the points which the pleadings are calculated to present when the cause shall be brought to a hearing for a final decree; but it does not follow that a decisive opinion is to be expressed in this stage of the cause upon the rights of all the parties; for, whatever may be the result of a motion of this kind, the general understanding is that it is without prejudice to the ultimate decision to which the court may be called upon to make. Insolvency and danger to the fund pending the litigation with a *prima facie* case and probable cause for sustaining the bill are or ought to be sufficient in the first instance to found an injunction and a receivership upon, without going minutely into the merits. My own observation has taught me to believe that, in general, it is most prudent and best promotes the ends of justice to go no further upon a motion. A decision of the cause is not, therefore, to be expected now. I am only about to look into it for the purpose of seeing whether a proper case for an injunction and a receiver is presented; and although I have to regret the unavoidable delay that has occurred, I am not aware that the pendency of this motion has retarded, as it certainly need not have done, other proceedings in the cause.

The first objection to the validity of the trust deed is that the board of directors, at which a resolution was adopted authorizing the creation of the trust and the execution of the deed, was not a regularly convened board according to the articles and by-laws of the association; and that, therefore, the deed, though bearing the signature of its proper officers, is not binding upon the company. I think this objection is not well founded. There was, in fact, a meeting of the board on the 4th January 1841, when a quorum was present and a resolution to the above effect was adop-

ted. How the meeting was convened and whether held or not in pursuance of the by-laws, as to the time of holding meetings, seems to me not material, so long as the meeting on that day was not objected to by any of the officers or directors then or at any subsequent time. All belonging to the direction have, apparently, acquiesced in the proceedings of that day, since none have been known to protest or object to the authority then conferred upon their officers. I shall, therefore, regard it as the act and deed of the company in its corporate capacity. It is another question, however, how far the company had power by law to issue such notes and to secure the payment thereof by such a transfer of property in trust as the deed contains.

This company or association was organized in July 1838, for the purposes of banking under the general banking law passed in April of that year. Whether such institutions were entitled to assume the character of corporations was a disputed point for some time and in various ways. Our courts at length settled down in the opinion that they were; and they now take rank accordingly. Like corporations, then, they possess all the powers expressly granted to them by the law of their creation, (the general banking law,) and such further powers not expressed as are incidental and necessary to the accomplishment of the business for which they are established. This common law principle, in relation to the powers of all corporations, is embodied in the enactment relative to the powers of these associations. They are declared to have power "to carry on the business of banking." How ? "By discounting bills, notes and other evidences of debt—by receiving deposits—by buying and selling gold and silver, bullion, foreign coins and bills of exchange in the manner specified in their articles of association for the purposes authorized by this act—by loaning money on real and personal security—and by exercising such incidental powers as shall be necessary to carry on such business." Here the business of banking is authorized; and in what that business shall consist, is defined. Their powers are co-extensive with and equal to the transaction of this business in all its branches. If not by express

enumeration of the powers, at least by necessary implication.

The manner of exercising one of their powers or rather of carrying on or conducting one branch of their authorized business—that of buying and selling the precious metals, coins and bills of exchange, appears to be left, in some measure, to the discretion of the associates, as the same shall be regulated and prescribed by their articles of association, yet in the articles of association of this company we find no such thing specified.

Among the powers confided to the board of directors for carrying on the banking business, is enumerated the " buying and selling gold and silver bullion, foreign coins and bills of exchange, in such manner as they may see fit for any purpose not prohibited by law :" (Art. IV. sec. 3.)   This seems not to be such a specification of the manner of doing that business, as the law intended, and it may perhaps give rise to the question whether the directors could lawfully enter upon the transaction of that branch of business at all unless the way, mode or manner of conducting it, (whether on credit or always for cash—whether with money to be borrowed for the purpose, or by appropriating a part of the capital paid in to that subject and to be kept employed therein,) was specified in the articles of association for their government.   Still, I shall consider, for the purposes of this discussion, that the articles of association are sufficiently specific to give the directors power to conduct that branch of business as well as others.   The other powers confided to the board of directors by the articles of association, so far as relates to the business of banking, are the same as those conferred by the law on the association itself—with some little addition or amplification—thus, to the power of receiving deposits is added " on interest or otherwise," and they may give to depositors " such receipts, bonds, bills or other evidences of debt as may be lawful."

From the course of dealing in which this company engaged and the disastrous results to which it led, it becomes somewhat important to consider, how far or for what purposes the company as a banking institution could lawfully borrow money?   There is no express recognition of the

power to borrow in the general banking law, nor are there any words of prohibition. If the power exists, it is by implication or as incidental to other powers expressly granted. "Receiving deposits," as understood in the practice of banking, is different from borrowing money in the ordinary acceptation of that term, and agreeing to allow interest on monies deposited with a bank and giving notes or certificates or any other evidences of debt therefor does not constitute the doing so an act of borrowing, hence the power of receiving deposits does not necessarily include the power of borrowing.

But the power to borrow may be incidental to the power of "discounting notes"; and why may not a banking association, as well as an individual banker, borrow money to be employed in that branch of business? I am at a loss to discover any good reason why they may not have the right to borrow for that purpose, if the state of their business, or the interest of the concern, shall justify it. Borrowing may be, and I think is, incidental also to the power of buying bills of exchange, bullion and foreign coin. These they may sell as well as purchase, and, in this unrestricted traffic, occasion may frequently arise for money to meet their engagements or to create funds abroad on which to place bills drawn by them for sale. The power of borrowing money may be called into exercise, likewise, for the purpose of buying or procuring state stocks and other securities to be deposited with the comptroller, though it certainly would be more consistent and compatible with the idea of a banking institution that it should be a lender at all times and never a borrower.

In throwing open the business of banking to individuals and to associations, the legislature, doubtless, supposed that actual capital would be honestly and fairly contributed by the individual stockholders, and not that the association, in its corporate capacity, should proceed upon the credit of a fictitious capital to borrow money or other means with which to commence or to carry on their business. Still, there is nothing in the terms of the original law directly prohibiting them; and it is now only by the amendatory act of May 14, 1840, that they cannot commence business until $100,000

of securities, at least, are deposited with the comptroller. These securities may yet be obtained by borrowed means.

While, therefore, we must concede to banking associations the power of borrowing money and of course to secure the repayment of it, by a pledge or transfer of property, if necessary, yet borrowing must be confined to the legitimate business of banking, and the necessity for it must proceed from that source. In other words, the money borrowed must be applied to some one or more of the purposes of their institution or creation as recognized in the law. Thus, they can have no right or power to borrow money or contract for loans to enable them to engage in speculations, or in mercantile or other business having no sort of relation to and forming no part of the ordinary business of a bank. Suppose they should buy cotton or other produce of the country and send it abroad, or should purchase ships and employ them in distant voyages with the view of placing cargoes in the hands of consignees, on the credit of which they might be enabled to draw bills of exchange, and should do this, under the pretence of exercising their corporate right of selling bills of exchange—would debts contracted in such a course of business and attempted to be secured by a pledge or hypothecation of the property contributed by stockholders be tolerated? I apprehend not. They could not be regarded as debts binding on the association, because not contracted for the purpose of the business confided to the directors. The unauthorized acts of agents are not binding on their principals; and directors are but agents or ministers, entrusted with powers to be exercised for the benefit of others. Those who have contributed to the formation of a banking capital by becoming shareholders; those who have entrusted their money on deposit, or have otherwise fairly become creditors of a bank, are entitled to protection against any unauthorized assumption of powers by the directors or any misapplication of the assets or funds of the institution. Its property cannot be diverted to other purposes or be used up in speculations foreign to the business of banking without a struggle for its recovery and an effort to reclaim it. A rigid adherence to this principle works no injustice, although it may sometimes produce a seeming hardship. Persons dealing with corpo-

1843.

LEAVITT
*v.*
YATES.

rations or associations of limited capacity, must look to the character of the transactions they engage in with them. The law under which they act and the business they are authorized to perform is all written in the public statute book, with which every man is supposed to be acquainted.

He who shall neglect to inform himself, can hardly have a valid excuse for being misled where every thing is open to inquiry. Still, there may be cases where a man may be innocently drawn in to lend his money, or part with his property, upon the strength of some supposed security or obligation which a company has issued, having the semblance of such as the company might lawfully issue and bearing upon its face no mark of legal condemnation or excess of authority. He may, in that way, become and claim to stand as a *bona fide* creditor, having had no reason to suspect that the money he furnished was wanted for any unauthorized purpose, or was to be applied to any other than the legitimate business of banking, and then, upon the doctrine favorring innocent *bona fide* purchasers without notice, be allowed to stand as a creditor to be paid out of the assets of the bank. The opinions delivered upon the final decision of *Safford* v. *Wyckoff*, 4 Hill's R. 442, shows the principle on which the holder of negotiable paper, issued by a banking association, may sustain an action and recover against them. Whether the holders of any of the 800 promissory notes in question can bring themselves within the principle above alluded to, may be a subject of consideration hereafter.

I have, now, to inquire whether the company could lawfully issue this mass of notes? The effect to be given to them in the hands of third persons, claiming to be innocent holders for value, is a different question.

I do not understand it to be claimed for these notes, that they were issued upon the basis of actual deposits with the company or for actual loans of money to be used in either of the specified branches of banking business. A very different purpose seems to have been contemplated. The pecuniary affairs of the company had become greatly embarrassed, owing to very extensive operations of a speculative character in state stocks, in which the company had been engaged. These stocks had greatly depreciated, as had also

all other securities, such as bonds and mortgages which the company held. In the early part of the year 1840, the company had obtained all that could be raised upon a pledge of the stocks and by various other expedients to which they had resorted. At the close of that year and in the beginning of 1841, (a memorable period,) the political horizon was lighted up with rays of hope, to many, of better prospects for the country and a brighter era in finance. The company, therefore, determined to make a further effort to avert, if possible, impending ruin and insolvency, by raising funds upon the issue of their notes or obligations to be secured by a pledge or assignment in trust of their remaining assets, consisting of various securities. The idea of getting up a subscription by individuals to advance money upon the notes or obligations of the company was suggested, and a paper to that effect, dated the 15th December, 1840, was signed by eight or nine of the directors, agreeing to take certain amounts set opposite their names in the obligations of the company and to pay cash therefor in monthly instalments, not exceeding ten per cent., commencing on the 1st day of January 1841, the payment of the obligations to be secured by a transfer in trust of assets belonging to the company ; but this subscription was not to be binding unless $400,000 should be subscribed. Only $245,000 was subscribed, and that paper seems not to have been further regarded, except as furnishing encouragement that loans upon this plan could be obtained. The effort was accordingly continued, and at the meeting of the board on the 4th day of January 1841, the chairman of the finance committee stated the necessity of creating a trust of $800,000, "for the purpose of providing funds for meeting the accruing payments of the company during the then next twelve months," by an issue of notes to the amount of $600,000, payable in thirteen months from the 15th December preceding. The measure was, therefore, resolved upon. There is much in the answer of the trustees explanatory of the motives of the directors in resorting to this expedient. They honestly believed it would furnish the means of enabling them to sustain the credit of the company and prolong its existence. They hoped to induce some of the creditors to accept notes thus secured for their

demands as collateral, and give time; and to obtain advances of money on other portions of the notes. There would appear to be nothing wrong in all this, provided the demands of existing creditors, which they wished to meet, had grown out of legitimate banking business, and provided the money expected to be raised was necessary, and was intended to be applied to the discharge of actual bona fide debts of that character.

Upon this point, there is very considerable difficulty in the case. I have shown the propriety of discriminating as to the character and consideration of the debts which had been contracted in the name of the company, and I apprehend it will be necessary to go into that investigation before the just and equitable rights of creditors and stockholders of this banking association on the one hand, and the holders of these eight hundred notes on the other, can be determined. As the case now stands upon the pleadings, that discrimination cannot be made; proofs will have to be gone into or inquiries instituted on the subject in a master's office. In the mean time, I think it is incumbent on the court to interfere. The propriety of applying the assigned assets of the company to the payment of the notes indiscriminately according to the trust deed, is too doubtful to be allowed at present, and must, therefore, be prevented.

An additional reason exists for placing the trustees under restraint. In issuing the notes in question, many of them were placed in the hands of persons as mere agents, who have made either none or but partial returns for them. Other notes and to large amounts have been handed over as collateral security for demands against the company of far less amount than their face, and yet the trustees, according to the express terms of the trust, and the covenant they have entered into, might not feel themselves at liberty to withhold payment from any person presenting one or more of the notes, however injuriously such payments might affect other rightful creditors.

There are other objections interposed on the ground of the illegality of the transaction, which it may be worth while to consider. It is contended that even if the company had the power to borrow money and supposing the

money thus raised to have been used or applied in the course of a legitimate banking business, still that they had no right to borrow upon the issue of notes in the manner and form in which these were made and issued ; that the general restraining law forbad such an emission and that the act of 14th May 1840, is also against it.

The answer denies any intention to evade or violate the laws of the state, and shows that the directors acted upon the opinions of counsel that they might lawfully issue the notes and secure the payment by an assignment in trust. It is, likewise, shown that the notes did not, upon their face or in appearance, resemble ordinary bank notes, that they were not from engraved plates, but in ordinary typography, and it is denied that they were issued for circulation as money within the meaning of the prohibitory laws.  Still, if the transaction was such as any law of the state has forbidden, honest intention and good faith in the belief of its lawfulness on the part of the directors will not uphold it. The transaction must be judged of according to the spirit and intention of the law and not solely by the motives which may have induced it.

The original restraining act incorporated into the revision of 1830, (1 R. S. 712,) is still in force ; and, for aught I see, is applicable to all banking associations and individual bankers, except so far as it is modified by the provisions of the general banking law allowing the issue of bills for circulation as money countersigned by the comptroller.  One of the offences against the franchise of banking, meant to be guarded against by that statute, is the issuing of notes or other evidences of debt by individuals or associations or bodies corporate, " to be loaned or put in circulation as money," without the express authority of law.  It is not the mere issue of notes, therefore, that is prohibited ; for individuals or corporations may issue any number that their convenience or lawful business may require, but it is the issue to be loaned out as money or to be put in circulation as such, so as to form a part of the circulating medium like bank notes, that the statute has prohibited as mischievious.

To constitute the offence, it is not necessary they should

1843.

LEAVITT
v.
YATES.

be on fine paper from engraved plates and ornamented with vignettes and devices symbolical of the bank. The style in which they are got up may be an evidence of the design with which they are issued and to give them a more ready circulation like bank notes; and that inference was drawn by the chancellor, in the case of the engraved notes of the Life and Fire Insurance Co.: *Attorney General* v. *Life and Fire Insurance Co.*, 9 Paige, 470. But this inference may be drawn from other facts and circumstances and be just as conclusive. Thus, with the eight hundred notes in question, they were uniformly printed and issued in a regular series, in sums corresponding with the larger denomination of bank notes, all payable at the same time, to the order of a clerk in the employ of the company, who endorsed them, not for the purpose of adding any thing to their security, but to give them currency without further trouble, in the same manner as bills payable on time to bearer. This, at least, shows they were adapted to the purposes of circulation and, purporting to be issued by a banking association, is an additional circumstance calculated to give them currency as money, like the post notes of the Life and Fire Insurance Co., which the chancellor held to be within the restraining act and void.

There are other and to my mind stronger reasons for imputing to the issue in question the character of circulating notes within the prohibition of the statute, notwithstanding the denials of the Answer. The avowed object was to raise money upon the strength of the notes secured by the trust. The securities placed in trust were not such as they could get countersigned notes for, from the comptroller, in sufficient amount or it is to be presumed they would have resorted to that mode of obtaining the desired relief. Hence they resorted to the other. The analogy is striking. Instead of a trust which the banking law authorized, they undertake to create one of their own. Instead of the comptroller for trustee and a pledge or deposit with him, they appoint other trustees and transfer such securities as they deem proper. Instead of notes payable on demand, they make them payable on time, and they are delivered out, not to persons lending or advancing money upon them, un-

der an agreement to hold the notes till maturity, but to directors and agents, willing to take charge of certain amounts and parcels of the notes, upon an understanding that they are afterwards, from time to time, to bring in money for the notes as they may be able to raise it. The persons to whom the notes are entrusted could accomplish this agency only by putting the notes in circulation, in the same manner that countersigned notes could be used for the like purpose.

Though the officers and directors of the company may say they did not, thereby, intend to give to the issue the effect of circulating notes, they are still chargeable with the mischief and the consequences which might naturally ensue from the act of giving out such paper, if they did not, at the same time, as I think they were bound to do, guard against the possibility of an abuse of the law, by limiting the negotiability or circulation to persons who might be found willing to lend money upon the security or to persons who might agree to take them for debts which they already held against the company and who could only part with the notes by further endorsement or assignment and not by mere delivery. The precaution of a special endorsement under an agreement to hold and not to put in circulation, would have taken from the notes the capability which they were otherwise calculated to have of becoming a part of the circulating medium and of inflating, to some, extent the currency of the country, which it had wisely become the policy of the government to prevent. If the intrinsic value of the property, which the company proposed to pledge, was such as to entitle them to credit and to confidence in respect to the loan which they wished to effect, they might have attained the end by making their notes or bonds payable directly to the lenders for the sums advanced or to be advanced by each, transferring the collaterals at the same time for security; and so, for the purpose of procuring an extension of credit where necessary, they might have sought out their creditors and proposed a renewal of previous notes or bonds becoming due upon the like arrangement; and in that way have avoided all legal objections to the means of

accomplishing these objects, at least so far as the restraining act might be thought to interfere.

I have, thus far, considered the issue of the eight hundred notes as within the mischief which it was the policy and intention of the general restraining act to prevent. And if I am correct in these views of the transaction, it is almost needless to say that it is within the prohibition also of the 4th section of the act of May 14, 1840, amendatory of the general banking law. Perhaps the legislature, in adopting this 4th section, did not intend to go further in respect to the character and object of the issue or circulation which they thereby meant to forbid than the previously existing restraining law had done, that is, to check the issue or circulation of post notes or bills as money; but there can be no doubt, from the strong and decisive tone of the section, that the legislature intended to go as far and prevent at least the issue of such bills or notes as were evidently designed or adapted to circulate as money and, more effectually to put a stop to the practice, on the part of any banking association or individual banker, they declare any violation of this section shall be adjudged a misdemeanor punishable by fine and imprisonment, while, for a violation of the original restraining act, a penalty or forfeiture of one thousand dollars alone is imposed. The conclusion, that the issue of the eight hundred notes was illegal, being not only unauthorized by the general banking law, looking to the purposes for which they were issued, but expressly prohibited as contrary to the policy of the laws regulating the banking system of this state, leaves nothing for the trust deed or the trust vested in the defendants Messrs. Yates, Talmage and Noyes to rest upon.

The notes must be deemed void and the assignment in trust will have to be set aside for that reason, irrespective of other objections and considerations which have been urged against it—such as that it was made in contemplation of the insolvency of the company and, in that event, was to give an undue preference to one class of creditors over others; that it was made to hinder and delay the general creditors, and therefore fraudulent in law; and that it was not made to secure existing debts, but prospective and contingent liabilities,

contingent in point of amount, and, therefore, not to be sustained against prior creditors.   These are objections which possibly may be effectual against the deed or assignment, though the notes themselves should be found to be valid and binding upon the company ; but it is unnecessary to go into a discussion of them at present.   Enough appears in the views I have thus far taken of the case to satisfy me that the trustees ought not and cannot, with propriety and with due regard to the rights of general creditors and stockholders, be allowed to hold and dispose of the property and assets assigned to them, pursuant to the trust.

In saying this, I do not wish to be understood as expressing an opinion, much less as deciding that none of the holders of the hundred notes can claim or be allowed to stand as creditors of the company by virtue of them.   It may be that, as *bona fide* holders for value, without notice, actual or constructive, of any thing affecting the validity of the notes, they may be permitted to occupy the place of honest creditors in the closing scenes of this great financial drama. Some of the parties to this suit are understood to have been creditors of the company before and at the time of the emission of the notes.   Perhaps they will be able to show that they became such creditors while dealing with the company in the way of legitimate banking business; and that they accepted some of the notes, supposing them to be valid, on account of such previous indebtedness.   There will be no difficulty, I apprehend, in such cases in considering such parties creditors still, upon the original footing of their debts.   Other creditors, it is said, were induced to accept some of the notes upon the strength of the trust with which they appeared to be connected and to relinquish other securities held by them at the time.   In such cases also there may be no difficulty with a court of equity in remitting the party to his original rights and securities, provided he shows his debt to have been a fair one and contracted within the scope of the lawful authority of the officers and directors of the company.   These, however, are reserved questions not necessary or proper now to be passed upon.   It will be in time to do that when all the facts and circumstances of each transaction shall be presented.   In

the meantime, the injunction prayed for must issue and the assigned property be secured in the hands of competent persons as receivers.

1843.

LEAVITT
v.
YATES.

After the appointment of a special receiver, an immense mass of testimony was taken. The abstract of the pleadings, before set forth, however, when taken in connection with the facts contained in the opinion of the Vice-Chancellor, will be enough for the present report on the merits.

Nov. 6, 7, 11, 12, 13, 18, 19, 20, 21 ; *Dec.* 1, 2.

The cause was now heard on pleadings and proofs.

Mr. *George Wood*, Mr. *Bidwell* and Mr. *Titus* appeared for the complainant.

Mr. *C. C. King*, Mr. *O'Conor* and Mr. *B. F. Butler*, for the defendants Palmers, Mackillop, Dent & Co.

Mr. *W. C. Noyes* and Mr. *Marvin* for the trustees.

Mr. *E. H. Blatchford*, for the receiver of the Commercial Bank and the Bank of the United States and the Girard Bank.

Mr. *F. B. Cutting*, for the defendants De Launay & Co.

Mr. *Charles Edwards*, for Samuel Clapham, the executor of William Vyse.

Mr. *Albon Man*, for the defendant Ezra Clark.

THE VICE-CHANCELLOR :—In granting the motion made in the early stage of this cause for an injunction and a receiver upon the bill and answers, I had occasion to express an opinion unfavorable to the validity of the trust deed of the 15th of December, 1840, and to the legality of the eight hundred promissory notes purporting to be notes of the " North American Trust and Banking Company," and which the deed was intended to secure, as being an emission of bills of credit or notes not authorized by law.

*Sept.* 22, 1846.

The same questions then considered, have again been

argued before me, but more *in extenso* upon the pleadings and voluminous proofs in the cause, with a view to a final decree which shall determine whether the complainant, as the receiver of the property and effects generally of this insolvent banking institution, is entitled to have the property, covered by the trust deed in question, placed in his hands as a part of the assets of the association, to be administered for the benefit of the legitimate creditors and stockholders, or whether the property shall remain with Messrs. Yates, Talmage and Noyes as trustees under the deed, for the purpose of being applied by them to the payment of the notes according to the trusts thereby declared: and if the deed is held to be void, then the other defendants, who are brought in as holders of many of the notes, (and some of them to a large amount,) present this further question, whether they are not, still, to be regarded as creditors of the banking association, with equitable liens upon the assigned property, and thereby entitled to a preference of payment over other creditors: and with regard to some of the defendants, this still further question, whether they are not entitled to be restored to the benefit of securities and money and other things of value parted with when they received the notes relying upon their validity and the good faith of the trust as a security?

In considering this case, the first objection to be noticed is an objection *in limine* to the complainants' right to draw in question the validity of the trust deed and the authority of the banking association to issue the notes—for it is said the complainant is here in a representative capacity merely—that he stands in the place of the defunct banking company, and has no better or other rights than it would have, were it a complainant. This is true. And then again it is further said, that inasmuch as the company could not be allowed to repudiate its own acts and deeds, so this receiver cannot. This, likewise, is true of acts done by the company in its corporate capacity through its proper officers or managers, in a matter of business or contract authorized by law, to be entered into and performed—but it cannot be true of acts done by the officers, managers or agents under an authority assumed and not really possessed, and in a matter

1843.

LEAVITT
v.
YATES.

of business not within the reach of the powers and authority conferred by law on the body corporate itself.

And again—the stockholders of this company being the corporators, and they having selected the officers to manage its affairs, if these officers have gone on, step by step, transcending their legal powers and authority, with the knowledge of the stockholders, they making no objection, nor taking any measures to stop such proceedings, their acquiescence will be presumed, and this be deemed a ratification on their part, so that it may also be true, as far as the rights and interests of stockholders alone are concerned, that the receiver will not be permitted to call these acts in question. But the receiver is not here as the mere representative of stockholders. It is in proof that there are creditors whose debts do not appear to be in any way provided for, and the rule as applicable to stockholders arising from their acquiescence in illegal transactions (if such there be) would not apply to innocent creditors, who could take no part in the management of the affairs of the company. It is competent, therefore, and Mr. Leavitt is at liberty to insist, that the deed in question, though executed by the proper officers of the company pursuant to a resolution of the board of directors, and with all the ceremony and formality of an act intended to be valid and binding, was, nevertheless, in its character a forbidden and unauthorized act, such as could only be done under an assumed or merely imaginary authority of law— and that the transaction which led to the making of the deed, as well as the deed itself and the notes and the trust to secure their payment, are all void. This brings me, then, directly to the question, are these acts void or are they valid in law? It can no longer admit of a question, and the point must now be regarded as definitely settled by the repeated decisions of the Chancellor and of the court for the correction of errors, that the banking institutions of this state, duly organized in conformity with the provisions of the act, passed the 18th of April, 1838, to authorize the business of banking, are corporations—and that the law creating them is a constitutional law, although not passed by a vote of two-thirds of the members elected to the legislature—the judgment of the supreme court in *De Bow* v. *The People*, 1

1843.

LEAVITT
*v.*
YATES.

Denio's Rep. 1,(*a*) to the contrary notwithstanding. They are not only corporations but they are "monied corporations" within the definition of that term in the revised statutes. As corporations, then, they can only have and exercise such powers as legitimately belong to them—that is to say, such as are expressly conferred by the general banking law and by some general provisions of the revised statutes and such as they take by necessary implication as incident to the powers expressly granted. At the same time, they are subject to such prohibition, regulations and restrictions as the revised statutes and other acts of the legislature have prescribed with respect to the business of banking.

My views on the subject of banking powers and banking business, as authorized to be conducted by associations and individuals professing to act under the restraints of law, (restraints imposed by a wise policy rendering the pursuit of such business a matter of franchise or privilege granted by the state,) and for what purposes, in the course of such business, they may lawfully borrow money and contract debts, were given in the opinion delivered by me on the motion before mentioned. I find no reason for changing the views I then expressed, and it is unnecessary to repeat them here. Looking to the law, as the only authority and guide in such matters, and I cannot but think that the officers and managers of this company transcended their powers as a corporation and departed widely from the legitimate business of a banking company when they went (extensively as they did,) into the buying and selling of state stocks and bonds.

The right of banking companies to purchase state stocks should be allowed to exist only when the object is a deposit or pledge of the same for circulating notes, or, if for any other purpose, it should be the investment of capital or surplus funds for the sake of interest. Now, the North American Trust and Banking Company had no capital or other funds on hand requiring to be thus invested. They bought the whole of that large amount of state stocks entirely upon credit, issuing their own paper in the shape of certificates of

(*a*) This case is now expressly overruled by *Gifford* v. *Livingston*, 2 Denio, 380.

deposit or of bonds or promissory notes in payment; and, in one instance at least, accompanied by the personal guarantee of some of the directors. The company never had any cash capital paid in beyond a comparatively few thousand dollars. The capital contributed by subscribers to its stock was in bonds and mortgages, exceeding in nominal amount three millions of dollars. These bonds and mortgages were, in effect, investments already made of the capital, so that nothing remained to be invested in any other description of securities. True, the company had taken measures to obtain a large subscription of cash capital in Europe, and its officers were led to believe they could obtain it. In that expectation they were disappointed—but, upon the strength of it they purchased, in August, 1838, immediately after the organization of the company, one million of dollars in amount of the public debt of the state of Arkansas. This purchase, though made upon credit in anticipation of a cash capital, may be justified as being within the authority of the officers and directors, since it appears to have been made with a view of using the bonds with the comptroller, as a basis for circulating notes to be issued by the company. It appears further, however, that only one-fifth of the amount ($200,-000,) was ever deposited with the comptroller. Being disappointed in obtaining a cash subscription to the capital abroad, the residue of the Arkansas bonds were diverted from the original purpose of the purchase and converted into a means of borrowing money. Had they rested here, relying upon the bonds and mortgages as constituting their capital, the company might possibly have succeeded, notwithstanding the million of debt they had contracted at the outset; but the views of the officers and managers were otherwise. In 1839 they proceeded to increase their debt enormously by the purchase of other state stocks, solely upon credit. One million two hundred thousand of Indiana bonds were bought, eight hundred thousand of Ohio securities, two hundred and fifty thousand of Florida bonds, and some hundreds of thousands of other descriptions of stocks and securities. None of these large amounts were obtained with any design or intention of being deposited with the comptroller for circulating notes. The contrary very clearly

1843.

LEAVITT
v.
YATES.

appears from the testimony.   The object was a speculation.
The stocks were to be sold again in expectation of profits.
It became a traffic in stocks, and, for that purpose, by far the
largest portion were sent to Europe, and, until sales could be
effected, they were to serve the purposes of a credit on which
to obtain advances or loans through the medium of bills of
exchange.   Twice an agent was sent out by the company
to aid in expediting sales and to attend to the financial opera-
tions generally in which the company was engaged.

There were other extensive operations of the company,
which seem to me not to have been within the pale of legi-
timate banking business.   I allude to the purchase of half
a million of southern funds, as they were called, being
the paper of southern and western banks, bought by the
company at a very considerable discount, because of the sus-
pension there of specie payments, and intended to be re-sold
at an expected profit or to be laid out in the purchase of
cotton at the south to be shipped to Europe.   These funds
were bought on credit, and not for the purpose of investing
capital or any money which the company had on hand.   A
portion of these funds were hypothecated and ultimately
sold; and a portion were used in the purchase of cotton
shipped to Europe and there sold.   By the testimony it ap-
pears that the loss sustained in this business was upwards
of two hundred thousand dollars ; on the sales of the cotton
alone the loss was ninety thousand dollars.

Another instance of unauthorized dealing, as it appears to
me, considering the circumstances of the company, may be
found in the buying up of some five or six thousand shares
of its own capital stock for the purpose of being sold out
again and, in the mean time, of being used as a means of
raising money.   These shares were paid for with the pro-
ceeds of bills of exchange procured to be drawn for the bene-
fit and on account of the company, to the amount of £46,875
sterling.   This transaction, like those preceding it, resulted
in a considerable loss.

Various other transactions were resorted to on behalf of
the company, as expedients for raising money or of placing,
at the disposal of its officers, the " ways and means" of ob-
taining a credit.   These were calculated to afford tempora-

ry relief, but they were generally such as, in the end, involved the company deeper and deeper in ruinous consequences.

The embarrassments of the company were partly owing to the want of a cash capital to begin with, but the principal cause of the difficulty in their affairs was the purchase of the large amount of state stocks, especially the one million two hundred thousand dollars of Indiana. This purchase appears to have laid the foundation of all the subsequent misfortunes of the company. The necessity of raising money to meet the payments for this large purchase, as well as of the first million purchase of Arkansas, created the necessity of resorting to the purchase of other large amounts of the same description of property, in order to place the company in possession of the means of raising money in the shape of advances or loans.

The necessity of resorting to such an expedient at one time, produced the necessity of a similar resort at another. Periods of great embarrassment followed each other in rapid succession. The stocks became more and more depreciated and the difficulty of obtaining advances adequate to their wants constantly increased; and, finally, the sales, when made, produced a loss to the company of somewhere from twenty-five to thirty per cent. on the cost. When, therefore, such operations, as I have alluded to, were found to be fallacious or were no longer available as "monied means," other expedients were resorted to. We accordingly find the directors and officers of the company engaged in issuing, from time to time, large amounts of certificates of deposit, sterling bonds and promissory notes, based upon assignments of bonds and mortgages, in trust for the purpose of securing the payment of such issues of paper. Hence, we hear of the " Million Trust," as it is called, and the " First Half Million Trust," and the " Second Half Million Trust," and other trusts of similar character, besides the Yates, Talmage and Noyes trust, the subject of the present suit.

This last trust was authorized by a resolution of the board of directors, of the 4th of January, 1841, though the deed and the notes bear date the 15th December, 1840. The finance committee had stated the necessity of creating this trust, as

1843.

LEAVITT
v.
YATES.

a means of providing funds to meet the accruing payments of the company during the then next twelve months, and that they had already made the arrangement for the transfer of securities to the amount of $800,000, and for the issue of notes to the amount of $600,000 ; and, therefore, requested the authority of the board to carry it into effect.    There had been a report made a short time before, by a special committee appointed to examine into the affairs of the company, showing its crippled condition and recommending the adoption of prompt and efficient measures to restore its credit and to render available its existing assets ; the committee expressing their belief that, by judicious management, confidence might be restored and the advantages expected from the formation of the company at the commencement might still be realized.    Hence it was that the proposition to create the trust in question was adopted.    The object was to raise money by making and disposing of this large batch of notes, purporting to be thus secured.    A similar undertaking had been started by an agreement drawn up on the 15th December, 1840, and signed by a number of the officers and directors, agreeing to take certain amounts, set opposite to their names, in the obligations of the company, payable in twelve months, with interest, and to pay the cash therefor in monthly instalments of ten per cent. ; such obligations being secured in like manner by a transfer in trust of assets belonging to the company ; but it was provided their subscriptions should not be binding until the amount of four hundred thousand dollars was subscribed.    Subscriptions to that amount were not obtained, and the plan was consequently abandoned. The notes under the trust deed, as authorized by the resolution of the board on the 4th of January, 1841, were, therefore, made without reference to any such previous agreement of the directors or other persons to take them and to furnish money upon loan or otherwise for the use of the company. The notes were rather intended, as it would seem, to be given out to the directors and any other persons who might be willing to aid the company by taking the notes in large or small amounts, either upon purchase or by loans of cash on the security of them or to be used in the best practical manner towards relieving the pressing necessities of the com-

1843.

LEAVITT
v.
YATES.

pany. It was, likewise, contemplated that the holders of previously issued bonds, notes and certificates of deposit, about maturing, might be induced to take some of this issue of notes in payment, exchange or renewal—such previous liabilities having been contracted originally in the purchase of the state stocks and in other business transactions before alluded to. The notes were used to a considerable extent for all these purposes, as I shall have occasion more particularly to notice.

The question at present is in respect to the entire mass of these notes, whether they are such as this banking company could lawfully issue ?

The objection against issuing them is, that not being based upon the pledge of securities with the comptroller, nor intended to be countersigned and registered as required by the banking law, it was an unlawful emission, such as is forbidden both by the general restraining law incorporated into the revised statutes, (1 R. S. 712, first edition, sec. 3 to 6,) and more particularly by the 4th section of the act passed May 14th, 1840, amendatory of the banking law under which this company was formed. This objection came under consideration in deciding the motion to which I have before alluded ; and my opinion was then expressed pretty fully upon the illegality of the issue of these notes. Subsequent examination and reflection have strengthened my conviction on the subject: for I have discovered nothing in the proofs or in the circumstances given in evidence to take the case out of the operation of the statutes referred to. A decision of the supreme court of this state in May term, 1846, in a case of *Swift et al.* v. *J D. Beers*, strongly corroborates my opinion. There, an action was brought upon Mr. Beers' guaranty of a note of the North American Trust and Banking Company, made payable sixty days after date, with interest, and the illegality of the note under the 4th section of the act of May 14th, 1840, was set up as a defence, which section forbids the issue of any bill or note by a banking association unless made payable on demand and without interest. That court held it to be a fatal objection to the note that it was payable on time, with interest, and immediately, on the close of the argument, gave judgment for the defendant.

The eight hundred notes in question are all of that character, being drawn payable thirteen months after date, and with interest at seven per cent.

The notes being utterly void, the accompanying assignment, creating a trust for the security and payment of the notes, has no legal effect and is of no avail to the parties claiming an interest under it. This is of itself a sufficient ground for declaring the assignment void and for breaking up the trust; it is, therefore, unnecessary to say much with respect to other legal objections that have been urged—one is, that the assignment was made when the company was insolvent or, if not insolvent, at least in contemplation of its insolvency, within the prohibition of the revised statutes: 1 R. S., first ed. 591, § 9.

A question has been made, whether the revised statutes, on the subject of preventing the insolvency of monied corporations and to secure the rights of their creditors and stockholders, apply to the banking institutions formed under the subsequent law of 1838? But so long as they are to be regarded as " monied corporations," (and, under the treatment they have received from the courts, they must be so regarded,) I see no good reason why that provision of the revised statutes should not be applied to them. That this banking company was in a state of insolvency at the close of the year 1840 is now manifest. Its failure in the course of the summer 1841 was owing, not to any fresh misfortunes it met with, but to the losses it had sustained in 1839 and 1840. The officers and directors may have believed, from the report of their committee of investigation and from the proposed plan of creating another trust in addition to those previously created, that they would be able to sustain the credit of the company, but this did not alter the fact of its having become bankrupt already. The issue of the notes based upon this trust was but another struggle, a last effort to resuscitate a dying institution; the effort failed and the institution sunk under the weight of accumulated liabilities. Those liabilities, for the present purpose, must be considered as debts. It is in vain, then, for those who had the management, to say they did not contemplate such an event, and that, instead of a failure, they looked forward to

1843.

LEAVITT
v.
YATES.

a restoration of the institution to public confidence and credit. Grant them this—admit they had faith in their efforts as the means of raising money and of satisfying the creditors and of averting the impending catastrophe, and it only obviates the objection so far as to show that it was done "in contemplation of insolvency," leaving the objection to stand solely upon the ground of the actual insolvent condition of the company at the time, and, therefore, equally within the prohibition of the statute.

Another objection is, that the trust assignment is fraudulent in law, in respect to the rights and remedies of existing creditors, having the effect to hinder and delay them in the collection of their lawful demands, a large amount of property being thereby tied up and placed beyond their reach.

When it is considered that the design was to place eight hundred thousand dollars worth of assets belonging to the company in the hands of third persons, not for the purpose directly and immediately of paying debts previously contracted and becoming due daily through the year 1841, but for the purpose of securing future liabilities then about to be contracted and payable only at the expiration of thirteen months from the date : I confess that it presents to my mind very much the appearance of a transaction which the law cannot fail to condemn as an obstacle and hinderance to the just rights of existing creditors. During the thirteen months the assigned property is locked up by the trust. It may not all be required for the purposes to which it is thereby appropriated. The whole of the notes may not be used and loans and advances to a limited extent only may be obtained upon them, and yet the property assigned is to remain wholly and entirely devoted to the trust until the expiration of the thirteen months at least. Besides, according to the estimated value of the assigned property, it exceeds the amount of the notes some two hundred thousand dollars. This large surplus placed under the trust, may be regarded as still further evidence of a fraudulent intent towards the general creditors in respect to the hinderance and delay it might occasion to them. But I forbear to pursue this topic, for it is unnecessary. If I should erroneously ascribe to the assignment and transfer the character of a

fraudulent conveyance, there must still be a decree against it, according to my judgment, on one or more of the other grounds that have been taken.

Although this disposes of the question touching the invalidity of the trust deed of assignment and of the notes, there are other important questions to be considered in regard to the holders of some of the notes, as to what are their rights upon the court pronouncing them void in their hands. They have been made defendants to the suit in order that these questions may be determined between them and the complainant as receiver. The effect of setting aside the trust deed and of decreeing a surrender of the trust property to the complainant, is to deprive all the holders of the eight hundred promissory notes, (notwithstanding they may have given value for them) of any right to stand as *cestui que trusts*, and in that capacity to claim an interest in or any benefit from the assigned property.

But it is contended that they are nevertheless to be regarded as equitable mortgagees of the property or as having liens in equity, which this court will enforce, though the property should pass into the hands of the receiver.

This claim to a protective equity is placed, in the first instance, upon the ground of their having made loans or advances of money or assumed liabilities for the company, on the strength of the trust and in faith of the security it was intended to afford. But to allow the claim in this light would be virtually to restore the trust and to give them the benefit of it by another name. It would be merely converting the receiver into a trustee for their benefit, in the place of the trustees under the deed of assignment. I cannot believe that the doctrine of equitable mortgages is to be applied so as to produce such a result. It cannot be that what the court is called upon by law to demolish with one hand, it is to reconstruct and uphold and give effect to under another form, with the other hand.

If any one or more of the persons, who have dealt with the company on the credit of the trust, have a right to follow the property into the hands of the receiver, charged with an equity in their favor, it must be a particular equity growing out of and dependent upon the circumstances of

each individual transaction, and not by virtue of a general equity which would apply to all and be equally available to all the holders of the notes who could show they had paid value for them. Such an equity, it seems to me, cannot arise from a loan or advance of money to the company, nor from endorsements or other liabilities assumed for it, which the party may have since paid or become bound to pay, even though made or assumed upon the faith of notes received at the time and believed to be notes valid in law and properly secured by the trust deed which afterwards turn out to have been invalid. Such failure of the security ought to have been foreseen. They who dealt with the company, on the footing of such security, took the risk of its failing them. Possibly, they may still be allowed to stand as creditors of the company. I am not going to say they are not—but if creditors, they are creditors at large, without any other security than what the insolvent condition of the institution may afford to all of them alike. The fact that the security they dealt upon has disappeared, has only placed them where other creditors stand and furnishes no reason why this court should undertake to create for them a new sort of security beyond what they were content to rely upon at the time. If the parties on lending their money or their credit to the company had, besides taking the notes, stipulated for a pledge or hypothecation of bonds and mortgages or other securities as collateral thereto for their reimbursement and indemnity and the notes proving to be illegal and void, they might then insist upon the fulfilment of the stipulation in respect to the pledge of collaterals as a part of the contract of loan. This would be a case of an equitable mortgage : Patch on Mort. 27, and this court would assist them in following the property thus pledged or intended to be and see to the application of it accordingly. So, if any of the parties, on taking portions of the notes in question for a precedent debt, surrendered any thing previously held as security for such precedent debt, relying upon the new security in the place of the old and such surrendered property has found its way into the hands of the complainant, the court will compel him to restore it, as a condition of the decree annulling the new security.

1843.

LEAVITT
v.
YATES.

This rests on the very familiar principle that he who seeks equity shall do equity.

Now, I know of no other equitable principles for these parties to place themselves upon, with a view to any special benefit from the assigned property, and if they have not brought themselves within either, they can have no such benefit from it.

It has been objected that without a cross bill these defendants are not in a position to ask such assistance or counter relief. I believe they can claim it as a condition of the relief granted to the other side without a cross bill. I shall, therefore, proceed to examine their respective claims.

The first I have to consider with reference to this subject is that of Mr. Henry Yates. His case is simply this. In January and February, 1841, he lent to the company his three promissory notes of $2500 each, payable at short periods, and which he paid as they became due. These notes were made solely for the accommodation of the company, and, at the time of giving his notes, he received as many of the trust notes as made up the same amounts, viz. $7,500. These notes he still holds. At other times, he endorsed for the accommodation of the company certain negotiable paper and at the same time the company made to him notes of corresponding amount and delivered to him certain of the trust notes as collateral security for his liabilities. Some of these liabilities are still outstanding, not having been paid, nor yet has he been discharged from them; and on account of those outstanding liabilities he still holds ten thousand dollars in amount of these trust notes. In other transactions Mr. Yates became possessed of other large amounts of the trust notes by purchase from Mr. Thomas E. Davis and of these he now holds fifteen thousand dollars in amount, making a total of trust notes held by Mr. Yates of $32,500, for which he claims to have an equitable lien.

In all these transactions, Mr. Yates does not appear to have relied on anything beyond the apparent goodness of the notes and the validity of the trust on which they were based. He asked for no better security, required no other pledge and took no stipulation for any other in the event of

1843.

LEAVITT
v.
YATES.

the failure of the trust deed. He had no promise of an assignment, deposit or transfer of bonds and mortgages or other securities for the specific purpose of meeting the liabilities he was under, or was about to assume, or to re-imburse the money he might lend or advance, or to pay the trust notes he might purchase. All that he appears to have taken any pains to satisfy himself about, besides what was expressed in the body of the trust deed and upon the face of the notes, was, that Mr. Davis and Mr. Strong, from whom he was about to receive some of the notes which had been issued or delivered to them by the company, had given or paid full value for such notes—and upon being informed by the president that such was the fact, he was satisfied to take the notes upon their own intrinsic merits. He sought for no additional security, and received no assurance that led him to expect any other or better. I do not, therefore, perceive any thing, in the nature of an equitable mortgage, which he has a right to fall back upon in the event that has happened or which the court can lay hold of and undertake to enforce for his particular benefit. Nor do I understand Mr. Yates as having parted with any thing when he received the trust notes or any of them, except money expended or applied to the payment of the debts of the company, as it is fair to presume before its failure, and no part of which has or is likely ever to come to the hands of the receiver. The same may be said of the moneys of other individuals who made advances and in whose behalf it has been urged, that restitution should be made by the receiver before he is permitted to disturb the trust. It is a sufficient answer to all that can be urged on this point, that restitution can only be made of specific money or securities identified by the party claiming and shown to be in the receiver's possession or about to be placed there.

The next, is the claim of the assignees and trustees of the United States Bank of Pennsylvania and of the assignees and trustees of the Girard Bank of Philadelphia. They hold a number of these trust notes, which were received by these banks in lieu of coupons for interest payable upon bonds or obligations issued by the company and secured or purporting to be secured by the first and second half mil-

lion trust deeds, and which bonds or obligations had been taken by these banks to secure certain loans they had made. The validity of those bonds and of the trusts spoken of, though questioned, are not to be passed upon in the present suit. But, supposing them to be valid, it does not appear that there was any thing attending the delivery of the notes in question as payment or security for the payment of interest on such bonds giving to these banks any special right or equity to a better security for the notes than the general trust on which they purported to be issued. The notes not having been paid, the interest on the bonds remains unsatisfied; and the assignees have all the remedy still which they ever had.

Next in order is Mr. Richard M. Blatchford, receiver of the Commercial Bank.

The Commercial Bank held a large number of the trust notes in question, now held by Mr. Blatchford as receiver, amounting in all to $80,500. The identity of the notes exhibited is sufficiently proved.

There were various transactions between this banking company and the Commercial Bank, in which these notes were made to serve the purpose of collateral security for other notes and liabilities of the former to the latter. In some instances they were taken in exchange for certificates of deposit issued by the company and held by the Commercial Bank and surrendered when the notes were received. Valuable consideration of some sort appears to have been given in every instance, either in the way of exchange for certificates of deposit, (a species of negotiable paper issued by the company,) or in the discount of paper for the company or for others, to which the notes were attached as collaterals. But in no instance do I find that the Commercial Bank received them upon any other understanding than that they were secured by the trust deed—there was nothing in the use to which the notes were thus applied that gave to them any special character or that furnished any particular ground of equity within the principles I have laid down.

I now come to the transactions of William Vyse, whose executor, Samuel Clapham, presents his claim as a matter of special equity. Mr. Vyse, at the time of his death, was

the holder of trust notes to the amount of $70,500, and these notes his executor now holds.

Mr. Vyse became a creditor of the company in this way. He bought of the company five bills of exchange, each for £2,000 sterling, drawn on the house of Palmers, Mackillop, Dent & Co., for which he paid in cash $46,777. The bills were sent to London, but were returned dishonored. He had also lent the company, in cash, at one time $10,000—at another time $10,000, and, at other times, two sums of $3000 each.

On purchasing the bills of exchange, the company delivered to him one hundred sterling bonds as they were called, each bond being for the payment of £250 sterling, these being a portion of the bonds which the company had made and undertaken to secure under and by virtue of either the million or the first or second half million trusts. These one hundred sterling bonds were delivered to Mr. Vyse by way of security to him for the due honor of the bills of exchange; and if the bills should be accepted and paid, he was to hand over the bonds to Messrs. Palmers, Mackillop, Dent & Co. for their use. On lending the two sums of ten thousand dollars each, the company assigned and delivered to Mr. Vyse for his security two bonds and mortgages belonging to the company, amounting together to $25,000, viz., the bond and mortgage of John McVickar for $12,000, given in October, 1838, and the bond and mortgage of Thomas Fitch for $13,000, given in September, 1838. On the return of the bills of exchange protested for non-acceptance, which was some time in January or February, 1841, Mr. Vyse stood as a creditor of the company to the amount of more than $70,000, and he was then solicited by the president of the company to give up the bills of exchange and the sterling bonds accompanying them and the two bonds and mortgages and take, in the place of them, the trust notes before mentioned to cover the indebtedness. He was reluctant to do so, but being strongly urged and relying upon the assurance of the president and the opinion of their counsel that the notes were valid and well secured by the trust deed, he finally consented, and did accordingly deliver up the bills of exchange and the sterling bonds, and re-assign the two bonds

and mortgages upon receiving from the company the trust notes now in the hands of his executor. The two bonds and mortgages of McVickar and Fitch are now among the assets of the company covered by the deed of assignment of the 15th of December 1840—they remain unpaid ; and upon setting aside the deed and trust, they will pass into the hands of the complainant. Under the circumstances of this transaction, seeing that Vyse was a creditor for money actually lent to the association, independent of the bills of exchange and upon the strength of the two bonds and mort-' gages transferred to him at the time as security for its repayment, those securities now coming into the hands of the complainant he is bound to restore, in order that they may again be held to answer the purpose of the original transfer to Vyse. So, with regard to the one hundred sterling bonds if they are still in existence uncancelled and in the possession or under the control of the complainant, he must, likewise, return them to Vyse's representative, in order that he may have the benefit of them as security for his debt, if indeed they can be deemed any better security than the trust notes he already holds. The protested bills of exchange, likewise, may be handed back if they can be found.

The claim of Mr. Ezra Clark is next to be considered. Mr. Clark is the holder of trust notes to the amount of $5000, received by him from the company in payment or exchange for a certificate of deposit of the like amount issued by the company some time in 1839. That certificate had been in pledge, and not having been redeemed it was sold at auction to the highest bidder, and Mr. Clark became the purchaser —at what price no where appears. He applied at the office of the company for payment of the certificate, and was prevailed on to take the amount in trust notes. The certificate he surrendered, and probably it has been cancelled. He surrendered no other security, for he had no other. There is no evidence that, in taking the notes, he had the promise or expectation of any other or additional security to which he might resort, in case the notes or the trust should prove a failure. Hence, there is nothing else in the shape of security which the court can now help him to receive.

Next is the case of Messrs. DeLaunay & Co., who are

made parties to this suit as holders of some of the trust notes.

Their transactions with the company consisted in their drawing bills of exchange in April, 1841, to a large amount on their house in Havre, payable in sixty days and deliver-ing the same to the company for its use, the company stipu-lating to furnish them in fifty-five days with an equal amount of bills of exchange adding interest, and, at the same time, delivering to them, for their security, sixty-four Arkan-sas state bonds of $1000 each and trust notes to the amount of $30,000 more. The company failed to comply with its stipulation except in part. Twenty-five of the Arkansas bonds were sold and the money applied to the bills of ex-change. The credit to the company was renewed for the balance by new bills of exchange drawn and delivered in June, 1841, under a similar stipulation, DeLaunay's house retaining the 39 Arkansas bonds and all the trust notes as before for their security. Subsequently, 14 more of the state bonds were sold and the proceeds applied to the bills of ex-change, so that, in October, 1841, the amount due from the company was reduced to $19,573, which balance is still due with interest, and they still remain in possession of the notes and in possession of the remaining 25 Arkansas state bonds. The bonds, however, have become so depreciated in market value, that, if sold, they would fall short of paying the bal-ance of the debt. The question is not whether the com-plainant shall restore to them any thing that may be likely to come into his hands, for DeLaunay & Co. have no specific claim of that sort to make. They only claim, as a matter of general equity, in the event of the trust and notes being void, to have the assigned property applied *pro tanto* to the payment of their balance ; and that they may be left in the undisturbed possession of the securities they hold. No ques-tion as to their right to take and hold and apply the Arkan-sas bonds in the way they have done and still propose to do has been made before me ; and, of course, the decree in this cause will not affect that question if it ever should arise.

I now come to the case of Messrs. Palmers, Mackillop, Dent & Co., of London, who have had very extensive finan-cial dealings and transactions with the company, and who

are made parties to this suit on account of large interests they have at stake in the trust and in the trust notes.

In 1839 and 1840, prior to August, the company had transmitted to the house of Palmers, Mackillop, Dent & Co., large quantities of the American securities before spoken of for sale. The company had also sent to them, for the like purpose, large amounts of the certificates of deposit and bonds issued by the company, payable in sterling money, and, therefore, denominated sterling bonds and sterling certificates and purporting to be secured by trusts. The shares also in the capital stock of the company, which had been bought up for account of the company itself, were likewise sent out in order to be sold again. Sales to a considerable extent were, from time to time, effected by Palmers, Mackillop, Dent & Co. Against the proceeds and upon the credit of the security which the possession of so much convertible property afforded or was supposed to afford, the company drew bills of exchange, which were duly honored and paid, generally in anticipation of cash receipts, so that Palmers, Mackillop, Dent & Co., were often called upon, in that way, to make advances of large sums for or on account of the company. In the course of this business from the commencement down to some time in the month of August, 1840, the cash receipts, which had come to the hands of Palmers, Mackillop, Dent & Co., from all sources on account of the company, exceeded seven hundred and eighty thousand pounds sterling. The drafts, in the mean time, had more than anticipated this great amount of money, and Palmers, Mackillop, Dent & Co., stood as creditors of the company for a large balance in their favor, with some remnants of securities on hand, but not sufficient to justify the company in making any further drafts upon them. The officers of the company nevertheless continued to draw more bills of exchange, and on the 31st July, 1840, drew seven bills, amounting to £7573 15s. 2d., all in favor of their own cashier, and by him endorsed to render them negotiable.

The drawing of these bills was accompanied by letters dated 1st August, 1840, addressed to Palmers, Mackillop, Dent & Co., one from the cashier, merely stating the fact that such bills had been drawn, which they would please to

honor and debit to the account of the banking company; and the other from the president, (Mr. Beers) explaining the necessity of making those drafts and showing reasons for inducing the drawees to honor them. The following are passages from Mr. Beers' letter, viz: "Under the arrangement entered into with the United States Bank and others, to meet our payments on the first of July and for several months to come, we have valued on you at this time for about £7500. This measure is adopted with the greatest reluctance, but it is wholly unavoidable. In addition to the surplus of $200,000 of mortgage bonds now in your hands we are preparing and shall send out at least $200,000 more of similar securities in a few days, it being our intention to keep you fully covered. Although these securities may not be at once available to you, we feel confident that you will, with the explanations you will receive from Mr. Blatchford, sanction our course.

"Unless we had come into this arrangement with the parties on the 1st ultimo, the bank must have suspended—an event which would have rendered the sale of the mortgage bonds impracticable and had a most baneful tendency in every respect. Should we not carry out the whole arrangement, and our bills drawn under it should now be dishonored, similar consequences would flow from it. We are calling in and liquidating our assets as rapidly as possible, and we feel well assured that, in a few months, with your countenance and support we can revive our credit and discharge our liabilities. I am mortified that the necessity of the case compels us to make a further appeal to your magnanimity, which has been so strongly manifested during our intercourse. The position in which we have been placed for the last few months has been trying in the extreme. To avert a sudden and consequently disastrous winding up of our affairs, has been our great aim—without your aid that unfortunate issue cannot be avoided."

The seven bills of exchange spoken of were presented on the 17th and 18th August, and were accepted—and on the 31st of the same month, Palmers, Mackillop, Dent & Co., replied to the letter from Mr. Beers, as follows:

"The matter of primary importance therein alluded to, is

the further negotiation of bills upon us to the extent of £7573 15*s*. 2*d*. After the very positive manner in which we wrote you on the 3d of June, we are now certainly surprised you should have adopted this course. You refer to explanations on the subject from Mr. Blatchford, but that gentleman has not written to us. We are aware that, in the last arrangement made by your institution with the United States and Girard Banks, mention is made of further drafts on London to the extent of $150,000, but without the slightest authority from us for such proceeding. Under your assurance that $200,000 further mortgage bonds are on the way to us, we have accepted the above amount, but we beg distinctly to inform you that any other bills that may appear will have to be returned and provided for in New York, as we can go no further, and we feel this course imperatively necessary, for the credit of the bank being so completely annihilated, all parties connected with it are liable to be more or less affected by such discredit."

Three days after writing this letter, Palmers, Mackillop, Dent & Co. were again surprised by the appearance of another bill of exchange drawn upon them in like manner as the others under date of the 8th August, 1840, for £2694 2*s*. 2*d*. This was accompanied by a letter from Mr. Beers, in which he says :

"We draw upon you to-day for £2694 2*s*. 2*d*. sterling, in favor of our cashier, and rely upon your acceptance. The bonds under the new trust for $250,000 will be sent by the Great Western, &c. In the mean time I beg you will be assured of our devoting all our efforts to put our institution in the best possible condition. We shall, in no case, value upon you unless under positive necessity, and, then, with a determination to protect you under any circumstances."

Notwithstanding the promise of further bonds, they refused at first to honor the bill, and it was noted for non-acceptance. A few days afterwards, however, at the instance of James B. Murray, the agent of the association at that time in London, they accepted the bill. They were induced to do this upon Mr. Murray's representations as to the abundant means of the company ultimately to meet all its engagements, and upon his stipulation, in regard to placing

them in possession of large amounts of other securities in 1843. the shape of mortgage bonds; it being contemplated, at the same time, that further bills of exchange might be drawn, LEAVITT v. YATES. which, with the eight bills already presented, would amount to £15,000. It was about this period also, that 125 bonds of £250 sterling each, purporting to be secured by a trust, were received in London by Palmers, Mackillop, Dent & Co., the same having been sent from New York on the 18th of August. Murray's stipulation, above alluded to, is contained in a letter addressed by him to Palmers, Mackillop, Dent & Co., dated London, Sept. 8th, 1840, and is to this effect: that, in consideration of their having consented to accept bills drawn, or to be drawn, subsequent to the 1st of August, to the extent of £7500, the company should deliver to their agent in New York such approved securities as would enable their agent to remit to them £15,000, that being the amount drawn (or supposed to be drawn) against the 125 bonds sent out, and such further bonds as were expected soon to arrive; that, for the purpose of enabling the company to furnish such approved security, all these bonds were to go back to New York by Mr. Melvil Wilson, and were to be delivered up to the company. On Mr. Wilson's arrival in New York in October, with the 125 bonds, he placed them in Mr. Blatchford's hands as the agent of Palmers, Mackillop, Dent & Co., for the purpose of being delivered up, on receiving other securities in pursuance of Murray's arrangement. The company was unable to comply with the arrangement. Securities that would produce the required amount in money, could not be furnished. A negotiation then took place. The company at length proposed to give fifty-two of the trust notes in question, of $1000 each, as a security for the acceptance of Palmers, Mackillop, Dent & Co., instead of the 125 bonds. This the agent agreed to accept, subject to the ratification of his principals. The notes were received and sent to London, and were accepted as security for £10,267 17s. 4d., (being the amount of the eight bills of exchange accepted and paid,) and the interest thereon; and upon this ratification of the agent's agreement, the 125 bonds were delivered up to the company. As an additional security, Palmers, Mackillop, Dent & Co. appear

to have obtained from the company twenty-five more of the same description of notes, making seventy-seven; and from James B. Murray, in some transaction with him, ten more, making in all eighty-seven notes of which they are at present the holders.

These facts sufficiently show how Palmers, Mackillop, Dent & Co., became possessed of the notes and the purposes for which they received them. The question is here, as in the other cases I have been considering, whether there is any special equity to be administered in their favor, on the notes turning out to be as valueless as so many pieces of blank paper? They will hardly be satisfied with a return of the 125 sterling bonds, which are admitted to be in the hands of the complainant, in the same condition as when they were delivered up to the company. These bonds in all probability are as little available as the notes. Whether they are equally invalid is a question not to be decided in this suit. If they were based upon a trust, that is, if a deed of trust was ever executed setting apart or appropriating any bonds and mortgages by way of securing the payment of these bonds, it is just as likely to be contested as were the trust deed and notes involved in the present suit. But was there ever, in reality, any trust or transfer of bonds and mortgages or other securities for the payment of these 125 bonds? On the face of the bonds they purport to be part of 450 bonds (numbered consecutively from 1801 to 2250, and these 125 are numbered, beginning with 1801 and going up to 1925 inclusive) issued by the company on the 1st day of February, 1840, when they bear date, and secured by a transfer of bonds and mortgages of various individuals, amounting in the aggregate to $600,000, under a deed of trust bearing even date therewith and placed in the hands of the three persons named as trustees, who were thereby irrevocably appointed to hold the same as a special pledge for the indemnity of the holders of the bonds. The company had at that period, (1st of February, 1840,) and by instruments of the same date founded what are denominated the "Million Trust," and the "First Half Million Trust," and the "Second Half Million Trust." The object of these three trusts was to secure the payment

of 1800 bonds in form like the 125 bonds and all of the same amount, viz. £250 sterling, with interest—900 bonds purported to be secured by the Million Trust and 450 by each of the Half Million Trusts—and these 1800 bonds were numbered consecutively from No. 1 to 1800. It seems to have been a part of the scheme for them to continue issuing bonds in the same consecutive order from 1800 upwards, as occasion should require, to be secured by a fourth trust of precisely similar character and in the hands of the same three trustees to the amount of $600,000. Four hundred and fifty bonds was the complement for this trust. One hundred and twenty-five of them were issued and used, importing a trust, but such deed of trust or transfer of property was never made. These bonds, however, are spoken of by some of the witnesses as bonds belonging to a trust for a quarter of a million loan. And we find Mr. Beers, in his letters of August, 1840, speaking of a new trust and of sending out bonds " under a new trust for $250,000," as an inducement for Palmers, Mackillop, Dent & Co. to accept the bills of exchange. How the one hundred and twenty-five bonds sent were to be connected with a trust to that amount, when they purport to be founded on a very different one, is not explained. A trust for a loan of two hundred and fifty thousand dollars was attempted to be created about the time these bonds were sent, but it appears to have been abandoned. A selection of bonds and mortgages for the purpose of being placed in such a trust was made and this was followed up by an entry in the journal of the " Real Estate Department," by which the " Banking Department" was debited with a list of bonds and mortgages, amounting to three hundred thousand seven hundred and eighty dollars, " put into the hands of R. M. Blatchford, Lewis Curtis and John L. Graham, trustees of $250,000 loan."

But, besides this entry in the book, there is no evidence of the bonds and mortgages having been actually delivered to the proposed trustees or that they ever consented to accept or take the trust upon themselves. If, however, Palmers, Mackillop, Dent & Co., as the holders of the 125 bonds, acquired any rights under that intended trust before

the completion of it was relinquished, then the relinquish-
ment of it would not affect those rights. But claiming as
holders of the bonds, it is for them to show that, by the
terms of the trust as proposed, it was intended to cover
these particular bonds. The proof on this point is feeble.
The fact is rather conjectural, than otherwise. The cir-
cumstance that the bonds were sent and received by them
as bonds secured by a trust, is scarcely to be taken as evi-
dence of the fact that they were secured by the identical
trust mentioned in the entry on the books, since this might
mean a trust for a loan having no reference to such bonds.
If, therefore, Palmers, Mackillop, Dent & Co. were still the
holders of the 125 bonds, I do not see that they have shown
a right to payment out of such a trust or out of the property
such a trust was intended to cover. But, aside from the
trust notes and the bonds—laying them entirely out of
view—treating them as no longer of any force or effect, not
even as evidence of an indebtedness, (and Palmers, Mac-
killop, Dent & Co., have no occasion to resort to the notes
or bonds for that purpose, for they have that evidence from
the eight bills of exchange ·which they accepted and paid
as mere accommodation acceptors,) an important question
is, whether, for the amount of those bills and interest,
they have not a claim in the nature of an equitable lien,
pledge or mortgage upon some portion of the assets or
effects belonging to the banking company at the time those
bills were drawn ?

They claim that they have such a lien in equity and
especially upon the twenty-six bonds and mortgage amount-
ing to $300,780, selected for the purpose of being put under
the new trust for a quarter of a million loan. These same
bonds and mortgages, it is admitted, were afterwards put
into the Yates, Talmage and Noyes trust and form a part
of the subject matter of this suit.

This question does not arise and they can have no pre-
tence for making such a claim if the payment of the bills
of exchange does not constitute a lawful debt or demand
against the banking company, owing to the unauthorized
and illegal character of the business in which this bank
was engaged and out of which the bills arose and to which

the monies paid upon them were applied. I am not disposed to create any doubt of that kind with respect to this demand. I shall regard Palmers, Mackillop, Dent & Co., as meritorious creditors for the £10,267 17s. 4d., paid upon the bills of exchange, as so much money advanced by way of loan to the banking company or paid for its use. Drawing the bills in favor of its own cashier at a time when there were no funds or convertible means in the hands of the drawees to meet the drafts, was, in effect, like sending its cashier personally to borrow so much money. It is true, there had been previously the extensive business of selling state stocks and bonds and securities and the drawing of bills of exchange, but the state of the business did not justify the banking company in drawing any more bills upon the credit of the depreciated and unconvertible property remaining unsold. The acceptance of the bills was, therefore, a matter of favor and deserves to be considered by itself as an independent transaction. So far as regards the banking company and its officers, the drawing of the bills was resorted to as a part of an arrangement entered into with the bank of the United States to raise funds to meet their payments on the first of July previously and for several months afterwards. This appears from Mr. Beers' letter of the 1st August, before quoted. But Palmers, Mackillop, Dent & Co., in their reply on the 31st August, entirely reject that as a ground of proceeding which was to affect them. After adverting to the positive manner in which, on the 3d of June, they had forbidden any more drafts upon them and expressing their surprise that the first seven bills should have appeared, they speak of being aware of the arrangement referred to for placing further drafts on London to the extent of $150,000, but expressly say that such a proceeding was without the slightest authority from them. They were not, therefore, in the least compromitted by that arrangement and it was not on that account they were induced to accept. Again, so far as the matter of pecuniary security was concerned, as an inducement for them to accept, Mr. Beers, in his letter, refers to a surplus of $200,000 of mortgage bonds in the hands of Palmers, Mackillop, Dent & Co., and to $200,000 more of similar securities they

were preparing to send in a few days. In their reply they put their inducement for accepting the bills on the ground of the "assurance that $200,000 further mortgage bonds" were on the way to them.

It thus appears that the security they relied upon for entering into this new and additional liability was the mortgage bonds already on hand and the further mortgage bonds preparing to be sent to them. The 125 bonds were shortly afterwards sent, as being the bonds promised and they were received as such without objection.

If this were the whole case, the most the court could do, in my opinion, would be to order those bonds to be restored to the possession of Palmers, Mackillop, Dent & Co. But their claim is made to reach beyond the mere restoration of the bonds. They seek to establish an equitable charge or lien upon the twenty-six bonds and mortgages alleged to have been set apart under the new trust for a quarter million loan. With every disposition and even effort on my part to discover sufficient facts to make out, by equitable construction, a pledge or mortgage of those securities for the payment of the bills of exchange, I confess myself at a loss how to do it. I can find nothing in the case before me that looks like a general or specific pledge of securities for the indemnity of the acceptors of the bills of exchange, except it be a pledge or hypothecation of "mortgage bonds" issued by this banking company, based upon a trust contrived by its officers. All the bonds and mortgages. ever taken by the company for capital stock or otherwise, were, I believe, sooner or later assigned, in order to make up a trust. I have not heard of one that escaped falling into the hands of a set of trustees, whereby to start some new issue of paper either for sale, as a commodity in the money markets or to be pledged for loans or to be given in exchange for previous liabilities. Hence it was that the banking company had no bonds and mortgages to pledge as security for the bills of exchange, nor did the president think of offering to Palmers, Mackillop, Dent & Co., the security of bonds and mortgages to be directly assigned to them or to any third person for their particular benefit or use. In his letter of the 10th of August, before quoted, containing the strongest

expressions of a "determination to protect them under any circumstances," Mr. Beers refers to no other means of doing so than by bonds under the new trust for $250,000; and in Murray's London letters interceding for the acceptance of the bills of exchange, it is "mortgage bonds" already in their hands and such additional "mortgage bonds" as should be sent to them that are alone spoken of as the securities specially pledged for the payment of any balance that should be found due to them from the company upon the closing of their account, as well as for the payment of "debenture certificates," a newly contrived issue of paper set on foot by Mr. Murray in London, as another means of raising money; and in his letter, also, of the 8th September, stipulating in behalf of the company to furnish "approved securities" in exchange for the 125 bonds, to be effected in New York and which resulted in the delivery of the 52 notes of the Yates, Talmage and Noyes trust, no mention is made, nor the least idea held out of any other form of "securities" than such as the banking company had been and still were in the practice of issuing, based upon the creation of trusts. This distinction I make is an obvious one. It is between bonds and mortgages executed to the banking company and used in making up some certain amount for a trust and assigned to trustees accordingly, and bonds or notes issued by the company purporting to be secured by a trust thus created. The latter were frequently the subject of hypothecation and pledge to the individual creditors of the company, but the former not—and in this instance, it was not the twenty-six bonds and mortgages which were promised as security, except through the medium of a trust in third persons; and it was only in that manner and through such a medium that creditors were to be benefitted. This was the promised security and nothing else. I cannot, therefore, undertake to create a direct lien or charge upon the 26 bonds and mortgages for the payment of the bills of exchange. All that the court of chancery can do, in cases like this, is to carry into effect the contract; to put the parties in possession of all they stipulate for and were to receive. This is upon the principle of considering that as done which was agreed to be done, provided it is not

1843.

LEAVITT
v.
YATES.

1843.

LEAVITT
v.
YATES.

against good morals, public policy or the positive enact-
ments of the legislature.

In this view of the case, Palmers, Mackillop, Dent & Co.
are entitled to have returned to them the 125 bonds, surren-
dered when they received the trust notes in question ;—and
if, by virtue of those bonds, they can establish a claim upon
any trust fund actually created or intended to be created or
upon any property or assets of the banking company set
apart and appropriated to the payment of the bonds and can
show a right to have the money raised out of any property
to which such trust has attached, in order to liquidate the
amount of the bills of exchange, they will be at liberty to
do so.   The decree may reserve to them the liberty of
taking such course as they may be advised for that purpose,
either against Mr. Leavitt the receiver or against any other
person who may have acquired possession of any of the
alleged trust property.

I have now done examining all the claims presented, on
the hearing of the cause, in behalf of holders of notes issued
under the trust deed of the 15th December, 1840, which
notes' and deed it has become my duty to declare void, as
being of no force and validity in the law against the com-
plainant in his capacity of Receiver.   There are a number of
other persons, besides the claimants I have mentioned, who
hold some of the notes, and have, therefore, been made parties
to this suit, but who have not appeared and answered.   Any
claims they have been supposed to have or hold, by virtue
of such notes, upon the property covered by the trust deed of
assignment, will be cut off by the decree I am about to make.

It must be understood, however, with respect to all the hol-
ders of these trust notes, that the decree is only to declare
the notes void in their hands, so that they are not to be used
as evidence of debt against the North American Trust and
Banking Company or its receiver.   Beyond this, I make no
decree affecting the holders of this paper.   I am not called
upon to determine, (because such determination is not ne-
cessarily involved in the case,) whether or not the persons,
who have received notes connected with this trust, are to be
considered as creditors of the company, irrespective of the
notes, and how far they may have a right to participate in

the distribution of the property which Mr. Leavitt, as the receiver, may hereafter make. It is rather incidentally, than otherwise, that I have intimated an opinion in respect to some of the parties dealing directly with the company, that they may go back to the original consideration on which their claims arose. Perhaps, throwing aside the notes, they may all be able to show that they are creditors to some amount if not to the whole amount of the notes.

The decree must contain a reservation of their rights in that respect.

With regard to the trustees, Messrs. Yates, Talmage and Noyes, the decree must direct them to surrender the property which passed into their hands under or by virtue of the trust deed and to account before a master for the disposition made of the same and of its proceeds. All those portions of the assigned property heretofore placed by any order of this court in the hands or possession of a special receiver, must likewise be given up to the complainant, with its proceeds, under the direction of a master, after all just allowance to the special receiver or receivers, who will then be discharged.

I have considered the point with regard to the allowances to be made to the trustees on the breaking up of the trust and the surrender of the property; and although the trust deed provides for a salary or compensation to them out of the property assigned, yet, as the whole thing was void, as being contrary to law and not merely voidable at the instance of creditors, I am of opinion they can have no just or valid claim to salary or compensation for any service they may have performed in relation to the trust or the property.

Their right, in that respect, fails them with the failure of their legal title, and the court of chancery cannot undertake to allow a compensation for services voluntarily undertaken and performed in relation to property, over which the parties could not lawfully assume and exercise a control for the purposes they intended. Whatever money has been expended in the keeping and preservation of the property or in the management of it with a view to its safety, while the title was in dispute, including reasonable clerk hire, the keeping

1843.

LEAVITT
v.
YATES.

of accounts and the expense of employing agents to look after the property when necessary, should be paid out of the property and be allowed to the trustees under the head of just allowances. This will be a matter for the master to ascertain and allow on passing their accounts.

I have, likewise, considered the question of costs, which is by no means an inconsiderable matter in a suit of this magnitude. With so many parties, such voluminous pleadings, depositions and exhibits, and so large an amount of money, or that which represents money, involved in the issue, this suit has scarcely had its parallel in this court.

A strong effort is made to have the complainant's costs charged upon the trustees personally, while they and the other defendants contend that their costs should be paid out of the property or funds going into the hands of the complainant.

Awarding costs is a matter of discretion in this court ;—a discretion to be regulated and determined by the particular circumstances of each case. The principal parties engaged in this suit are acting in representative capacities ; not suing or defending on their own individual personal rights ; generally, such parties are not charged with costs to be paid out of their own pockets. While I think the trustees, Messrs. Yates, Talmage and Noyes, may be excused from paying the complainant's costs of the suit, because, from the position in which they stood, they could not well do otherwise than defend it, yet considering that they were not strangers to the transactions of the banking company when they consented to become trustees and undertook the performance of the trust, I do not feel justified in saying that they are to have their costs out of the property or fund. The least I can do is to leave them to bear their own costs of the suit, while the complainant is left to charge his costs to the fund coming into his hands. So, with regard to creditors who have appeared and set up claims and have succeeded to some extent in regard to particular equities : they also are entitled to taxable costs out of the fund. This, however, extends only to the executor of Vyse and to Palmers, Mackillop, Dent & Co.